48 U.S. 1 (1849)
7 How. 1
MARTIN LUTHER, PLAINTIFF IN ERROR,
v.
LUTHER M. BORDEN ET AL. DEFENDANTS IN ERROR.[*]
RACHEL LUTHER, COMPLAINANT,
v.
LUTHER M. BORDEN ET AL., DEFENDANTS.
Supreme Court of United States.

*19 The case was argued by Mr. Hallett and Mr. Clifford, for the plaintiff in error, although the brief was signed by Mr. Turner, Mr. Hallett, Mr. R.J. Walker, and Mr. Clifford. On the part of the defendant in error, it was argued by Mr. Whipple and Mr. Webster.
*34 Mr. Chief Justice TANEY delivered the opinion of the court.
This case has arisen out of the unfortunate political differences which agitated the people of Rhode Island in 1841 and 1842.
It is an action of trespass brought by Martin Luther, the plaintiff in error, against Luther M. Borden and others, the defendants, in the Circuit Court of the United States for the District of Rhode Island, for breaking and entering the plaintiff's house. The defendants justify upon the ground that large numbers of men were assembled in different parts of the State for the purpose of overthrowing the government by military force, and were actually levying war upon the State; that, in order to defend itself from this insurrection, the State was declared by competent authority to be under martial law; that the plaintiff was engaged in the insurrection; and that the defendants, being in the military service of the State, by command of their superior officer, broke and entered the house and searched the rooms for the plaintiff, who was supposed to be there concealed, in order to arrest him, doing as little damage as possible. The plaintiff replied, that the trespass was committed by the defendants of their own proper wrong, and without any such cause; and upon the issue joined on this replication, the parties proceeded to trial.
The evidence offered by the plaintiff and the defendants is *35 stated at large in the record; and the questions decided by the Circuit Court, and brought up by the writ of error, are not such as commonly arise in an action of trespass. The existence and authority of the government under which the defendants acted was called in question; and the plaintiff insists, that, before the acts complained of were committed, that government had been displaced and annulled by the people of Rhode Island, and that the plaintiff was engaged in supporting the lawful authority of the State, and the defendants themselves were in arms against it.
This is a new question in this court, and certainly a very grave one; and at the time when the trespass is alleged to have been committed it had produced a general and painful excitement in the State, and threatened to end in bloodshed and civil war.
The evidence shows that the defendants, in breaking into the plaintiff's house and endeavoring to arrest him, as stated in the pleadings, acted under the authority of the government which was established in Rhode Island at the time of the Declaration of Independence, and which is usually called the charter government. For when the separation from England took place, Rhode Island did not, like the other States, adopt a new constitution, but continued the form of government established by the charter of Charles the Second in 1663; making only such alterations, by acts of the legislature, as were necessary to adapt it to their condition and rights as an independent State. It was under this form of government that Rhode Island united with the other States in the Declaration of Independence, and afterwards ratified the Constitution of the United States and became a member of this Union; and it continued to be the established and unquestioned government of the State until the difficulties took place which have given rise to this action.
In this form of government no mode of proceeding was pointed out by which amendments might be made. It authorized the legislature to prescribe the qualification of voters, and in the exercise of this power the right of suffrage was confined to freeholders, until the adoption of the constitution of 1843.
For some years previous to the disturbances of which we are now speaking, many of the citizens became dissatisfied with the charter government, and particularly with the restriction upon the right of suffrage. Memorials were addressed to the legislature upon this subject, urging the justice and necessity of a more liberal and extended rule. But they failed to produce the desired effect. And thereupon meetings were held and associations formed by those who were in favor of a more extended right of suffrage, which finally resulted in the election *36 of a convention to form a new constitution to be submitted to the people for their adoption or rejection. This convention was not authorized by any law of the existing government. It was elected at voluntary meetings, and by those citizens only who favored this plan of reform; those who were opposed to it, or opposed to the manner in which it was proposed to be accomplished, taking no part in the proceedings. The persons chosen as above mentioned came together and framed a constitution, by which the right of suffrage was extended to every male citizen of twenty-one years of age, who had resided in the State for one year, and in the town in which he offered to vote for six months, next preceding the election. The convention also prescribed the manner in which this constitution should be submitted to the decision of the people,  permitting every one to vote on that question who was an American citizen, twenty-one years old, and who had a permanent residence or home in the State, and directing the votes to be returned to the convention.
Upon the return of the votes, the convention declared that the constitution was adopted and ratified by a majority of the people of the State, and was the paramount law and constitution of Rhode Island. And it communicated this decision to the governor under the charter government, for the purpose of being laid before the legislature; and directed elections to be held for a governor, members of the legislature, and other officers under the new constitution. These elections accordingly took place, and the governor, lieutenant-governor, secretary of state, and senators and representatives thus appointed assembled at the city of Providence on May 3d, 1842, and immediately proceeded to organize the new government, by appointing the officers and passing the laws necessary for that purpose.
The charter government did not, however, admit the validity of these proceedings, nor acquiesce in them. On the contrary, in January, 1842, when this new constitution was communicated to the governor, and by him laid before the legislature, it passed resolutions declaring all acts done for the purpose of imposing that constitution upon the State to be an assumption of the powers of government, in violation of the rights of the existing government and of the people at large; and that it would maintain its authority and defend the legal and constitutional rights of the people.
In adopting this measure, as well as in all others taken by the charter government to assert its authority, it was supported by a large number of the citizens of the State, claiming to be a majority, who regarded the proceedings of the adverse party as *37 unlawful and disorganizing, and maintained that, as the existing government had been established by the people of the State, no convention to frame a new constitution could be called without its sanction; and that the times and places of taking the votes, and the officers to receive them, and the qualification of the voters, must be previously regulated and appointed by law.
But, notwithstanding the determination of the charter government, and of those who adhered to it, to maintain its authority, Thomas W. Dorr, who had been elected governor under the new constitution, prepared to assert the authority of that government by force, and many citizens assembled in arms to support him. The charter government thereupon passed an act declaring the State under martial law, and at the same time proceeded to call out the militia, to repel the threatened attack and to subdue those who were engaged in it. In this state of the contest, the house of the plaintiff, who was engaged in supporting the authority of the new government, was broken and entered in order to arrest him. The defendants were, at the time, in the military service of the old government, and in arms to support its authority.
It appears, also, that the charter government at its session of January, 1842, took measures to call a convention to revise the existing form of government; and after various proceedings, which it is not material to state, a new constitution was formed by a convention elected under the authority of the charter government, and afterwards adopted and ratified by the people; the times and places at which the votes were to be given, the persons who were to receive and return them, and the qualification of the voters, having all been previously authorized and provided for by law passed by the charter government. This new government went into operation in May, 1843, at which time the old government formally surrendered all its powers; and this constitution has continued ever since to be the admitted and established government of Rhode Island.
The difficulties with the government of which Mr. Dorr was the head were soon over. They had ceased before the constitution was framed by the convention elected by the authority of the charter government. For after an unsuccessful attempt made by Mr. Dorr in May, 1842, at the head of a military force, to get possession of the State arsenal at Providence; in which he was repulsed, and an assemblage of some hundreds of armed men under his command at Chepatchet in the June following, which dispersed upon the approach of the troops of the old government, no further effort was made to establish it; and until the constitution of 1843 went into operation the charter government continued to assert its authority *38 and exercise its powers, and to enforce obedience, throughout the State, arresting and imprisoning, and punishing in its judicial tribunals, those who had appeared in arms against it.
We do not understand from the argument that the constitution under which the plaintiff acted is supposed to have been in force after the constitution of May, 1843, went into operation. The contest is confined to the year preceding. The plaintiff contends that the charter government was displaced, and ceased to have any lawful power, after the organization, in May, 1842, of the government which he supported, and although that government never was able to exercise any authority in the State, nor to command obedience to its laws or to its officers, yet he insists that it was the lawful and established government, upon the ground that it was ratified by a large majority of the male people of the State of the age of twenty-one and upwards, and also by a majority of those who were entitled to vote for general officers under the then existing laws of the State. The fact that it was so ratified was not admitted; and at the trial in the Circuit Court he offered to prove it by the production of the original ballots, and the original registers of the persons voting, verified by the oaths of the several moderators and clerks of the meetings, and by the testimony of all the persons so voting, and by the said constitution; and also offered in evidence, for the same purpose, that part of the census of the United States for the year 1840 which applies to Rhode Island; and a certificate of the secretary of state of the charter government, showing the number of votes polled by the freemen of the State for the ten years then last past.
The Circuit Court rejected this evidence, and instructed the jury that the charter government and laws under which the defendants acted were, at the time the trespass is alleged to have been committed, in full force and effect as the form of government and paramount law of the State, and constituted a justification of the acts of the defendants as set forth in their pleas.
It is this opinion of the Circuit Court that we are now called upon to review. It is set forth more at large in the exception, but is in substance as above stated; and the question presented is certainly a very serious one: For, if this court is authorized to enter upon this inquiry as proposed by the plaintiff, and it should be decided that the charter government had no legal existence during the period of time above mentioned,  if it had been annulled by the adoption of the opposing government,  then the laws passed by its legislature during that time were nullities; its taxes wrongfully collected; its salaries and compensation *39 to its officers illegally paid; its public accounts improperly settled; and the judgments and sentences of its courts in civil and criminal cases null and void, and the officers who carried their decisions into operation answerable as trespassers, if not in some cases as criminals.
When the decision of this court might lead to such results, it becomes its duly to examine very carefully its own powers before it undertakes to exercise jurisdiction.
Certainly, the question which the plaintiff proposed to raise by the testimony he offered has not heretofore been recognized as a judicial one in any of the State courts. In forming the constitutions of the different States, after the Declaration of Independence, and in the various changes and alterations which have since been made, the political department has always determined whether the proposed constitution or amendment was ratified or not by the people of the State, and the judicial power has followed its decision. In Rhode Island, the question has been directly decided. Prosecutions were there instituted against some of the persons who had been active in the forcible opposition to the old government. And in more than one of the cases evidence was offered on the part of the defence similar to the testimony offered in the Circuit Court, and for the same purpose; that is, for the purpose of showing that the proposed constitution had been adopted by the people of Rhode Island, and had, therefore, become the established government, and consequently that the parties accused were doing nothing more than their duty in endeavoring to support it.
But the courts uniformly held that the inquiry proposed to be made belonged to the political power and not to the judicial; that it rested with the political power to decide whether the charter government had been displaced or not; and when that decision was made, the judicial department would be bound to take notice of it as the paramount law of the State, without the aid of oral evidence or the examination of witnesses; that, according to the laws and institutions of Rhode Island, no such change had been recognized by the political power; and that the charter government was the lawful and established government of the State during the period in contest, and that those who were in arms against it were insurgents, and liable to punishment. This doctrine is clearly and forcibly stated in the opinion of the Supreme Court of the State in the trial of Thomas W. Dorr, who was the governor elected under the opposing constitution, and headed the armed force which endeavored to maintain its authority
Indeed, we do not see how the question could be tried and *40 judicially decided in a State court. Judicial power presupposes an established government capable of enacting laws and enforcing their execution, and of appointing judges to expound and administer them. The acceptance of the judicial office is a recognition of the authority of the government from which it is derived. And if the authority of that government is annulled and overthrown, the power of its courts and other officers is annulled with it. And if a State court should enter upon the inquiry proposed in this case, and should come to the conclusion that the government under which it acted had been put aside and displaced by an opposing government, it would cease to be a court, and be incapable of pronouncing a judicial decision upon the question it undertook to try. If it decides at all as a court, it necessarily affirms the existence and authority of the government under which it is exercising judicial power.
It is worthy of remark, however, when we are referring to the authority of State decisions, that the trial of Thomas W. Dorr took place after the constitution of 1843 went into operation. The judges who decided that case held their authority under that constitution; and it is admitted on all hands that it was adopted by the people of the State, and is the lawful and established government. It is the decision, therefore, of a State court, whose judicial authority to decide upon the constitution and laws of Rhode Island is not questioned by either party to this controversy, although the government under which it acted was framed and adopted under the sanction and laws of the charter government.
The point, then, raised here has been already decided by the courts of Rhode Island. The question relates, altogether, to the constitution and laws of that State; and the well settled rule in this court is, that the courts of the United States adopt and follow the decisions of the State courts in questions which concern merely the constitution and laws of the State.
Upon what ground could the Circuit Court of the United States which tried this case have departed from this rule, and disregarded and overruled the decisions of the courts of Rhode Island? Undoubtedly the courts of the United States have certain powers under the Constitution and laws of the United States which do not belong to the State courts. But the power of determining that a State government has been lawfully established, which the courts of the State disown and repudiate, is not one of them. Upon such a question the courts of the United States are bound to follow the decisions of the State tribunals, and must therefore regard the charter government as the lawful and established government during the time of this contest.
*41 Besides, if the Circuit Court had entered upon this inquiry, by what rule could it have determined the qualification of voters upon the adoption or rejection of the proposed constitution, unless there was some previous law of the State to guide it? It is the province of a court to expound the law, not to make it. And certainly it is no part of the judicial functions of any court of the United States to prescribe the qualification of voters in a State, giving the right to those to whom it is denied by the written and established constitution and laws of the State, or taking it away from those to whom it is given; nor has it the right to determine what political privileges the citizens of a State are entitled to, unless there is an established constitution or law to govern its decision.
And if the then existing law of Rhode Island which confined the right of suffrage to freeholders is to govern, and this question is to be tried by that rule, how could the majority have been ascertained by legal evidence, such as a court of justice might lawfully receive? The written returns of the moderators and clerks of mere voluntary meetings, verified by affidavit, certainly would not be admissible; nor their opinions or judgments as to the freehold qualification of the persons who voted. The law requires actual knowledge in the witness of the fact to which he testifies in a court of justice. How, then, could the majority of freeholders have been determined in a judicial proceeding?
The court had not the power to order a census of the freeholders to be taken; nor would the census of the United States of 1840 be any evidence of the number of freeholders in the State in 1842. Nor could the court appoint persons to examine and determine whether every person who had voted possessed the freehold qualification which the law then required. In the nature of things, the Circuit Court could not know the name and residence of every citizen, and bring him before the court to be examined. And if this were attempted, where would such an inquiry have terminated? And how long must the people of Rhode Island have waited to learn from this court under what form of government they were living during the year in controversy?
But this is not all. The question as to the majority is a question of fact. It depends upon the testimony of witnesses, and if the testimony offered by the plaintiff had been received, the defendants had the right to offer evidence to rebut it; and there might, and probably would, have been conflicting testimony as to the number of voters in the State, and as to the legal qualifications of many of the individuals who had voted. The decision would, therefore, have depended upon the relative *42 credibility of witnesses, and the weight of testimony; and as the case before the Circuit Court was an action at common law, the question of fact, according to the seventh amendment to the Constitution of the United States, must have been tried by the jury. In one case a jury might find that the constitution which the plaintiff supported was adopted by a majority of the citizens of the State, or of the voters entitled to vote by the existing law. Another jury in another case might find otherwise. And as a verdict is not evidence in a suit between different parties, if the courts of the United States have the jurisdiction contended for by the plaintiff, the question whether the acts done under the charter government during the period in contest are valid or not must always remain unsettled and open to dispute. The authority and security of the State governments do not rest on such unstable foundations.
Moreover, the Constitution of the United States, as far as it has provided for an emergency of this kind, and authorized the general government to interfere in the domestic concerns of a State, has treated the subject as political in its nature, and placed the power in the hands of that department.
The fourth section of the fourth article of the Constitution of the United States provides that the United States shall guarantee to every State in the Union a republican form of government, and shall protect each of them against invasion; and on the application of the legislature or of the executive (when the legislature cannot be convened) against domestic violence.
Under this article of the Constitution it rests with Congress to decide what government is the established one in a State. For as the United States guarantee to each State a republican government, Congress must necessarily decide what government is established in the State before it can determine whether it is republican or not. And when the senators and representatives of a State are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority. And its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal. It is true that the contest in this case did not last long enough to bring the matter to this issue; and as no senators or representatives were elected under the authority of the government of which Mr. Dorr was the head, Congress was not called upon to decide the controversy. Yet the right to decide is placed there, and not in the courts.
So, too, as relates to the clause in the above-mentioned article of the Constitution, providing for cases of domestic violence. *43 It rested with Congress, too, to determine upon the means proper to be adopted to fulfil this guarantee. They might, if they had deemed it most advisable to do so, have placed it in the power of a court to decide when the contingency had happened which required the federal government to interfere. But Congress thought otherwise, and no doubt wisely; and by the act of February 28, 1795, provided, that, "in case of an insurrection in any State against the government thereof, it shall be lawful for the President of the United States, on application of the legislature of such State or of the executive (when the legislature cannot be convened), to call forth such number of the militia of any other State or States, as may be applied for, as he may judge sufficient to suppress such insurrection."
By this act, the power of deciding whether the exigency had arisen upon which the government of the United States is bound to interfere, is given to the President. He is to act upon the application of the legislature or of the executive, and consequently he must determine what body of men constitute the legislature, and who is the governor, before he can act. The fact that both parties claim the right to the government cannot alter the case, for both cannot be entitled to it. If there is an armed conflict, like the one of which we are speaking, it is a case of domestic violence, and one of the parties must be in insurrection against the lawful government. And the President must, of necessity, decide which is the government, and which party is unlawfully arrayed against it, before he can perform the duty imposed upon him by the act of Congress.
After the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right? Could the court, while the parties were actually contending in arms for the possession of the government, call witnesses before it and inquire which party represented a majority of the people? If it could, then it would become the duty of the court (provided it came to the conclusion that the President had decided incorrectly) to discharge those who were arrested or detained by the troops in the service of the United States or the government which the President was endeavoring to maintain. If the judicial power extends so far, the guarantee contained in the Constitution of the United States is a guarantee of anarchy, and not of order. Yet if this right does not reside in the courts when the conflict is raging, if the judicial power is at that time bound to follow the decision of the political, it must be equally bound when the contest is over. It cannot, when peace is restored, punish as offences and crimes the acts which it before recognized, and was bound to recognize, as lawful.
*44 It is true that in this case the militia were not called out by the President. But upon the application of the governor under the charter government, the President recognized him as the executive power of the State, and took measures to call out the militia to support his authority if it should be found necessary for the general government to interfere; and it is admitted in the argument, that it was the knowledge of this decision that put an end to the armed opposition to the charter government, and prevented any further efforts to establish by force the proposed constitution. The interference of the President, therefore, by announcing his determination, was as effectual as if the militia had been assembled under his orders. And it should be equally authoritative. For certainly no court of the United States, with a knowledge of this decision, would have been justified in recognizing the opposing party as the lawful government; or in treating as wrongdoers or insurgents the officers of the government which the President had recognized, and was prepared to support by an armed force. In the case of foreign nations, the government acknowledged by the President is always recognized in the courts of justice. And this principle has been applied by the act of Congress to the sovereign States of the Union.
It is said that this power in the President is dangerous to liberty, and may be abused. All power may be abused if placed in unworthy hands. But it would be difficult, we think, to point out any other hands in which this power would be more safe, and at the same time equally effectual. When citizens of the same State are in arms against each other, and the constituted authorities unable to execute the laws, the interposition of the United States must be prompt, or it is of little value. The ordinary course of proceedings in courts of justice would be utterly unfit for the crisis. And the elevated office of the President, chosen as he is by the people of the United States, and the high responsibility he could not fail to feel when acting in a case of so much moment, appear to furnish as strong safeguards against a wilful abuse of power as human prudence and foresight could well provide. At all events, it is conferred upon him by the Constitution and laws of the United States, and must therefore be respected and enforced in its judicial tribunals.
A question very similar to this arose in the case of Martin v. Mott, 12 Wheat. 29-31. The first clause of the first section of the act of February 28, 1795, of which we have been speaking, authorizes the President to call out the militia to repel invasion. It is the second clause in the same section which authorizes the call to suppress an insurrection against a State *45 government. The power given to the President in each case is the same,  with this difference only, that it cannot be exercised by him in the latter case, except upon the application of the legislature or executive of the State. The case above mentioned arose out of a call made by the President, by virtue of the power conferred by the first clause; and the court said, that, "whenever a statute gives a discretionary power to any person to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and exclusive judge of the existence of those facts." The grounds upon which that opinion is maintained are set forth in the report, and we think are conclusive. The same principle applies to the case now before the court. Undoubtedly, if the President in exercising this power shall fall into error, or invade the rights of the people of the State, it would be in the power of Congress to apply the proper remedy. But the courts must administer the law as they find it.
The remaining question is whether the defendants, acting under military orders issued under the authority of the government, were justified in breaking and entering the plaintiff's house. In relation to the act of the legislature declaring martial law, it is not necessary in the case before us to inquire to what extent, nor under what circumstances, that power may be exercised by a State. Unquestionably a military government, established as the permanent government of the State, would not be a republican government, and it would be the duty of Congress to overthrow it. But the law of Rhode Island evidently contemplated no such government. It was intended merely for the crisis, and to meet the peril in which the existing government was placed by the armed resistance to its authority. It was so understood and construed by the State authorities. And, unquestionably, a State may use its military power to put down an armed insurrection, too strong to be controlled by the civil authority. The power is essential to the existence of every government, essential to the preservation of order and free institutions, and is as necessary to the States of this Union as to any other government. The State itself must determine what degree of force the crisis demands. And if the government of Rhode Island deemed the armed opposition so formidable, and so ramified throughout the State, as to require the use of its military force and the declaration of martial law, we see no ground upon which this court can question its authority. It was a state of war; and the established government resorted to the rights and usages of war to maintain itself, and to overcome the unlawful opposition. And in that state of things the officers engaged in its military service *46 might lawfully arrest any one, who, from the information before them, they had reasonable grounds to believe was engaged in the insurrection; and might order a house to be forcibly entered and searched, when there were reasonable grounds for supposing he might be there concealed. Without the power to do this, martial law and the military array of the government would be mere parade, and rather encourage attack than repel it. No more force, however, can be used than is necessary to accomplish the object. And if the power is exercised for the purposes of oppression, or any injury wilfully done to person or property, the party by whom, or by whose order, it is committed would undoubtedly be answerable.
We forbear to remark upon the cases referred to in the argument, in relation to the commissions anciently issued by the kings of England to commissioners, to proceed against certain descriptions of persons in certain places by the law martial. These commissions were issued by the king at his pleasure, without the concurrence or authority of Parliament, and were often abused for the most despotic and oppressive purposes. They were used before the regal power of England was well defined, and were finally abolished and prohibited by the petition of right in the reign of Charles the First. But they bear no analogy in any respect to the declaration of martial law by the legislative authority of the State, made for the purposes of self-defence, when assailed by an armed force; and the cases and commentaries concerning these commissions cannot, therefore, influence the construction of the Rhode Island law, nor furnish any test of the lawfulness of the authority exercised by the government.
Upon the whole, we see no reason for disturbing the judgment of the Circuit Court. The admission of evidence to prove that the charter government was the established government of the State was an irregularity, but is not material to the judgment. A Circuit Court of the United States sitting in Rhode Island is presumed to know the constitution and law of the State. And in order to make up its opinion upon that subject, it seeks information from any authentic and available source, without waiting for the formal introduction of testimony to prove it, and without confining itself to the process which the parties may offer. But this error of the Circuit Court does not affect the result. For whether this evidence was or was not received, the Circuit Court, for the reasons herein before stated, was bound to recognize that government as the paramount and established authority of the State.
Much of the argument on the part of the plaintiff turned upon political rights and political questions, upon which the *47 court has been urged to express an opinion. We decline doing so. The high power has been conferred on this court of passing judgment upon the acts of the State sovereignties, and of the legislative and executive branches of the federal government, and of determining whether they are beyond the limits of power marked out for them respectively by the Constitution of the United States. This tribunal, therefore, should be the last to overstep the boundaries which limit its own jurisdiction. And while it should always be ready to meet any question confided to it by the Constitution, it is equally its duty not to pass beyond its appropriate sphere of action, and to take care not to involve itself in discussions which properly belong to other forums. No one, we believe, has ever doubted the proposition, that, according to the institutions of this country, the sovereignty in every State resides in the people of the State, and that they may alter and change their form of government at their own pleasure. But whether they have changed it or not by abolishing an old government, and establishing a new one in its place, is a question to be settled by the political power. And when that power has decided, the courts are bound to take notice of its decision, and to follow it.
The judgment of the Circuit Court must therefore be affirmed.

RACHEL LUTHER v. LUTHER M. BORDEN ET AL.
Mr. Chief Justice TANEY delivered the opinion of the court.
This case has been sent here under a certificate of division from the Circuit Court for the District of Rhode Island. It appears, on the face of the record, that the division was merely formal, and that the whole case has been transferred to this court, and a multitude of points (twenty-nine in number) presented for its decision. We have repeatedly decided that this mode of proceeding is not warranted by the act of Congress, authorizing the justices of a Circuit Court to certify to the Supreme Court a question of law which arose at the trial, and upon which they differed in opinion. And many cases in which, like the present one, the whole case was certified, have been dismissed for want of jurisdiction. The same disposition must be made of this. The material points, however, have been decided in the case of Martin Luther against the same defendants, in which the opinion of this court has been just delivered, and which was regularly brought up by writ of error upon the judgment of the Circuit Court. The case before us depends mainly upon the same principles, and, indeed, grew out of the same transaction; and the parties will understand the *48 judgment of this court upon all the material points certified, from the opinion it has already given in the case referred to.
This case is removed to the Circuit Court.

MARTIN LUTHER v. LUTHER M. BORDEN ET AL.
Mr. Justice WOODBURY, dissenting.
The writ in this case charges the defendants with breaking and entering the plaintiff's dwelling-house, on the 29th of June, 1842, and doing much damage.
The plea in justification alleges, that, on June 24th, 1842, an assembly in arms had taken place in Rhode Island, to overawe and make war upon the State. And therefore, in order to protect its government, the legislature, on the 25th of that month, passed an act declaring the whole State to be under martial law. That the plaintiff was assisting in traitorous designs, and had been in arms to sustain them, and the defendants were ordered by J. Child, an officer in the militia, to arrest the plaintiff, and, supposing him within the house named in the writ, to break and enter it for the purpose of fulfilling that order; and, in doing this, they caused as little damage as possible.
The replication denied all the plea, and averred that the defendants did the acts complained of in their own wrong, and without the cause alleged.
To repel the defence, and in vindication of the conduct of the plaintiff, much evidence was offered; the substance of which will be next stated, with some leading facts proved on the other side in connection with it.
The people of Rhode Island had continued to live under their charter of 1663 from Charles the Second, till 1841, with some changes in the right of suffrage by acts of the legislature, but without any new constitution, and still leaving in force a requirement of a freehold qualification for voting. By the growth of the State in commerce and manufactures, this requirement had for some time been obnoxious; as it excluded so many adult males of personal worth and possessed of intelligence and wealth, though not of land, and as it made the ancient apportionment of the number of representatives, founded on real estate, very disproportionate to the present population and personal property in different portions and towns of the State.
This led to several applications to the legislature for a change in these matters, or for provision to have a convention of the people called to correct it by a new constitution. These all failing, voluntary societies were med in 1841. *49 and a convention called by them of delegates, selected by the male adults who had resided one year in the State, with a view chiefly to correct the right of suffrage and the present unequal apportionment of representatives. This, though done without the formalities or recommendation of any statute of the State, or any provision in the charter, was done peacefully, and with as much care and form as were practicable without such a statute or charter provision. A constitution was formed by those delegates, a vote taken on its ratification, and an adoption of it made, as its friends supposed, and offered to prove, by a decided majority, both of the freehold voters and of the male adults in the State.
Political officers for the executive and legislative departments were then chosen under it by those in its favor, which officers assembled on the 3d of May, 1842, and took their respective oaths of office and appointed several persons to situations under the constitution, and among them the existing judges of the superior court.
After transacting some other business the next day,  but the old officers in the State under the charter not acknowledging their authority, nor surrendering to them the public records and public property,  they adjourned till July after, and never convened again, nor performed any further official duties. Nor did they institute actions for the possession of the public records and public property; but T. Dorr, the person elected governor, at the head of an armed force, on the 25th of June, 1842, in his supposed official capacity, made some attempt to get possession of the public arsenal; but failing in it, he dismissed the military assembled, by a written order, on the 27th of June, and left the State. He stated as a reason for this, "that a majority of the friends of the people's constitution disapprove of any further forcible measures for its support."
In the mean time, the officers under the old charter, having, as before suggested, continued in possession of the public records and property, and in the discharge of their respective functions, passed an act, on the 24th of June, placing the State under martial law. A proclamation was then issued by the governor, warning the people not to support the new constitution or its officers, and another act was passed making it penal to officiate under it. An application was made to the President of the United States for assistance in quelling the disturbances apprehended, but was answered by him on the 29th of May, 1842, not complying with the request, though with expressions of willingness to do it, should it, in his opinion afterwards become necessary.
Nothing further seems to have been done by him in the *50 premises, except that on the 29th of June, the day of the trespass complained of in this action, a proclamation was prepared under his direction, but not issued, denouncing such of the supporters of the new constitution as were in arms to be "insurgents," and commanding them to disperse.
It was next shown by the respondents, that Dorr, the governor elect under the new constitution, was, in August, 1842, indicted for treason against the State, and being apprehended in 1844, was then tried and convicted.
It further appears that the court, at the trial of the present cause, ruled out the evidence offered by the plaintiff in support of his conduct, and admitted that which went to justify the defendants, and decided that the old charter, and not the new constitution, was in force at the time the act passed declaring martial law, and that this law was valid, and, as pleaded, justified the defendants in their behaviour.
Without entering here at more length into details concerning the unhappy controversy which agitated Rhode Island in 1842, it is manifest that it grew out of a political difficulty among her own people, in respect to the formation of a new constitution. It is not probable that the active leaders, and much less the masses, who were engaged on either side, had any intention to commit crimes or oppress illegally their fellow-citizens. Such, says Grotius, is usually, in civil strife, the true, liberal view to be taken of the masses. (Grotius on War, B. 3, ch. 11, sec. 6.) And much more is it so, when, in a free country, they honestly divide on great political principles, and do not wage a struggle merely for rapine or spoils. In this instance each side appears to have sought, by means which it considered lawful and proper, to sustain the cause in which it had embarked, till peaceful discussions and peaceful action unexpectedly ripened into a resort to arms, and brother became arrayed against brother in civil strife. Fortunately, no lives were destroyed, and little property injured. But the bitterness consequent on such differences did not pass off without some highly penal legislation, and the extraordinary measure of the establishment of martial law over the whole State. Under these circumstances, it is too much to expect, even at this late day, that a decision on any branch of this controversy can be received without some of the leaven of former political excitement and prejudice, on the one side or the other, by those who were engaged in its stirring scenes. Public duty, however, seems to require each member of this court to speak freely his own convictions on the different questions which it may be competent for us to decide; and when one of those members, like myself, has the misfortune to differ in any respect from the rest, to explain *51 with frankness, and undeterred by consequences, the grounds of that difference.
This difference, however, between me and my brethren extends only to the points in issue concerning martial law. But that being a very important one in a free government, and this controversy having arisen in the circuit to which I belong, and where the deepest interest is felt in its decision, I hope to be excused for considering that point fully; and for assigning, also, some additional and different reasons why I concur with the rest of the court in the opinion, that the other leading question, the validity of the old charter at that time, is not within our constitutional jurisdiction. These two inquiries seem to cover the whole debatable ground, and I refrain to give an opinion on the last question, which is merely political, under a conviction that, as a judge, I possess no right to do it, and not to avoid or conceal any views entertained by me concerning them, as mine, before sitting on this bench and as a citizen, were frequently and publicly avowed.
It must be very obvious, on a little reflection, that the last is a mere political question. Indeed, large portions of the points subordinate to it, on this record, which have been so ably discussed at the bar, are of a like character, rather than being judicial in their nature and cognizance. For they extend to the power of the people, independent of the legislature, to make constitutions,  to the right of suffrage among different classes of them in doing this,  to the authority of naked majorities,  and other kindred questions, of such high political interest as during a few years to have agitated much of the Union, no less than Rhode Island.
But, fortunately for our freedom from political excitements in judicial duties, this court can never with propriety be called on officially to be the umpire in questions merely political. The adjustment of these questions belongs to the people and their political representatives, either in the State or general government. These questions relate to matters not to be settled on strict legal principles. They are adjusted rather by inclination,  or prejudice or compromise, often. Some of them succeed or are defeated even by public policy alone, or mere naked power, rather than intrinsic right. There being so different tastes as well as opinions in politics, and especially in forming constitutions, some people prefer foreign models, some domestic, and some neither; while judges, on the contrary, for their guides, have fixed constitutions and laws, given to them by others, and not provided by themselves. And those others are no more Locke than an Abbé Sieyes, but the people. Judges, for constitutions, must go to the people of their own country, and must *52 merely enforce such as the people themselves, whose judicial servants they are, have been pleased to put into operation.
Another evil, alarming and little foreseen, involved in regarding these as questions for the final arbitrament of judges would be, that in such an event all political privileges and rights would, in a dispute among the people, depend on our decision finally. We would possess the power to decide against as well as for them, and under a prejudiced or arbitrary judiciary the public liberties and popular privileges might thus be much perverted, if not entirely prostrated. But, allowing the people to make constitutions and unmake them, allowing their representatives to make laws and unmake them, and without our interference as to their principles or policy in doing it, yet, when constitutions and laws are made and put in force by others, then the courts, as empowered by the State or the Union, commence their functions and may decide on the rights which conflicting parties can legally set up under them, rather than about their formation itself. Our power begins after their ends. Constitutions and laws precede the judiciary, and we act only under and after them, and as to disputed rights beneath them, rather than disputed points in making them. We speak what is the law, jus dicere, we speak or construe what is the constitution, after both are made, but we make, or revise, or control neither. The disputed rights beneath constitutions already made are to be governed by precedents, by sound legal principles, by positive legislation, clear contracts, moral duties, and fixed rules; they are per se questions of law, and are well suited to the education and habits of the bench. But the other disputed points in making constitutions, depending often, as before shown, on policy, inclination, popular resolves, and popular will, and arising not in respect to private rights,  not what is meum and tuum,  but in relation to politics, they belong to politics, and they are settled by political tribunals, and are too dear to a people bred in the school of Sydney and Russel for them ever to intrust their final decision, when disputed, to a class of men who are so far removed from them as the judiciary; a class, also, who might decide them erroneously as well as right, and if in the former way, the consequences might not be able to be averted except by a revolution, while a wrong decision by a political forum can often be peacefully corrected by new elections or instructions in a single month. And if the people, in the distribution of powers under the constitution, should ever think of making judges supreme arbiters in political controversies, when not selected by nor, frequently, amenable to them, nor at liberty to follow such various considerations in their judgments as *53 belong to mere political questions, they will dethrone themselves and lose one of their own invaluable birthrights; building up in this way  slowly, but surely  a new sovereign power in the republic, in most respects irresponsible and unchangeable for life, and one more dangerous, in theory at least, than the worst elective oligarchy in the worst of times. Again, instead of controlling the people in political affairs, the judiciary in our system was designed rather to control individuals, on the one hand, when encroaching, or to defend them, on the other, under the Constitution and the laws, when they are encroached upon. And if the judiciary at times seems to fill the important station of a check in the government, it is rather a check on the legislature, who may attempt to pass laws contrary to the Constitution, or on the executive, who may violate both the laws and Constitution, than on the people themselves in their primary capacity as makers and amenders of constitutions.
Hence the judiciary power is not regarded by elementary writers on politics and jurisprudence as a power coördinate or commensurate with that of the people themselves, but rather coördinate with that of the legislature. Kendall v. U. States, 12 Peters, 526. Hence, too, the following view was urged, when the adoption of the Constitution was under consideration:  "It is the more rational to suppose that the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority." (Federalist, No. 77, by Hamilton.) "Nor does the conclusion by any means suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both," &c., &c.
But how would this superiority be as to this court, if we could decide finally on all the political claims and acts of the people, and overrule or sustain them according only to our own views? So the judiciary, by its mode of appointment, long duration in office, and slight accountability, is rather fitted to check legislative power than political, and enforce what the political authorities have manifestly ordained. These last authorities are, by their pursuits and interests, better suited to make rules; we, to expound and enforce them, after made.
The subordinate questions which also arise here in connection with the others, such as whether all shall vote in forming or amending those constitutions who are capable and accustomed to transact business in social and civil life, and none others; and whether, in great exigencies of oppression by the legislature itself, and refusal by it to give relief, the people may not take the subject into their own hands, independent of the legislature; *54 and whether a simple plurality in number on such an occasion, or a majority of all, or a larger proportion, like two thirds or three fourths, shall be deemed necessary and proper for a change; and whether, if peacefully completed, violence can afterwards be legally used against them by the old government, if that is still in possession of the public property and public records; whether what are published and acted on as the laws and constitution of a State were made by persons duly chosen or not, were enrolled and read according to certain parliamentary rules or not, were in truth voted for by a majority or two thirds;  these and several other questions equally debatable and difficult in their solution are in some aspects a shade less political. But they are still political. They are too near all the great fundamental principles in government, and are too momentous, ever to have been intrusted by our jealous fathers to a body of men like judges, holding office for life, independent in salary, and not elected by the people themselves.
Non nostrum tantas componere lites. Where, then, does our power, as a general rule, begin? In what place runs the true boundary-line? It is here. Let the political authorities admit as valid a constitution made with or without previous provision by the legislature, as in the last situation Tennessee and Michigan were introduced into the Union. (See Federalist, No. 40, and 2 Ell. Deb. 57; 13 Regis by Y. 95, 1164, and Cong. Globe, App., 78, 137, 147.) Let the collected will of the people as to changes be so strong, and so strongly evinced, as to call down no bills of pains and penalties to resist it, and no arming of the militia or successful appeals to the general government to suppress it by force, as none were in some cases abroad as well as in America, and one recently in New York, which might be cited beside those above. (See A.D. 1846, and opinion of their judges.) In short, let a constitution or law, however originating, be clearly acknowledged by the existing political tribunals, and be put and kept in successful operation. The judiciary can then act in conformity to and under them. (Kemper v. Hawkins, 1 Virg. Cas., 74, App.) Then, when the claims of individuals come in conflict under them, it is the true province of the judiciary to decide what they rightfully are under such constitutions and laws, rather than to decide whether those constitutions and laws themselves have been rightfully or wisely made.
Again, the Constitution of the United States enumerates specially the cases over which its judiciary is to have cognizance, but nowhere includes controversies between the people of a State as to the formation or change of their constitutions. *55 (See Article 3, sec. 2.) Though at first the federal judiciary was empowered to entertain jurisdiction where a State was a party in a suit, it has since been deprived even of that power by a jealous country, except in cases of disputed boundary. (Article 3, sec. 2; Amendment 11th; Massachusetts v. Rhode Island, 12 Peters, 755.)
If it be asked what redress have the people, if wronged in these matters, unless by resorting to the judiciary, the answer is, they have the same as in all other political matters. In those, they go to the ballot-boxes, to the legislature or executive, for the redress of such grievances as are within the jurisdiction of each, and, for such as are not, to conventions and amendments of constitutions. And when the former fail, and these last are forbidden by statutes, all that is left in extreme cases, where the suffering is intolerable and the prospect is good of relief by action of the people without the forms of law, is to do as did Hampden and Washington, and venture action without those forms, and abide the consequences. Should strong majorities favor the change, it generally is completed without much violence. In most states, where representation is not unequal, or the right of suffrage is not greatly restricted, the popular will can be felt and triumph through the popular vote and the delegates of the people in the legislature, and will thus lead soon, and peacefully, to legislative measures ending in reform, pursuant to legislative countenance and without the necessity of any stronger collateral course. But when the representation is of a character which defeats this, the action of the people, even then, if by large majorities, will seldom be prosecuted with harsh pains and penalties, or resisted with arms.
Changes, thus demanded and thus supported, will usually be allowed to go into peaceful consummation. But when not so allowed, or when they are attempted by small or doubtful majorities, it must be conceded that it will be at their peril, as they will usually be resisted by those in power by means of prosecutions, and sometimes by violence, and, unless crowned by success, and thus subsequently ratified, they will often be punished as rebellious or treasonable.
If the majorities, however, in favor of changes happen to be large, and still those in power refuse to yield to them, as in the English revolution of 1688, or in our own of 1776, the popular movement will generally succeed, though it be only by a union of physical with moral strength; and when triumphant, it will, as on those occasions, confirm by subsequent forms of law what may have begun without them.
There are several other questions, also, which may arise under our form of government that are not properly of judicial *56 cognizance. They originate in political matters, extend to political objects, and do not involve any pecuniary claims or consequences between individuals, so as to become grounds for judicial inquiry. These questions are decided sometimes by legislatures, or heads of departments, or by public political bodies, and sometimes by officers, executive or military, so as not to be revisable here. (See Decatur v. Paulding, 14 Peters, 497.)
Looking to all these considerations, it appears to me that we cannot rightfully settle those grave political questions which, in this case, have been discussed in connection with the new constitution; and, as judges, our duty is to take for a guide the decision made on them by the proper political powers, and, whether right or wrong according to our private opinions, enforce it till duly altered. But it is not necessary to rest this conclusion on reasoning alone. Several precedents in this court, as well as in England, show the propriety of it.
In Foster et al. v. Neilson, 2 Peters, 309, where the title to the property depended on the question, whether the land was within a cession by treaty to the United States, it was held that after our government, legislative and executive, had claimed jurisdiction over it, the courts must consider that the question was a political one, the decision of which, having been made in this manner, they must conform to. (See, also, 6 Peters, 711, and Garcia v. Lee, 12 Peters, 520; 13 Peters, 419.) In The Cherokee Nation v. The State of Georgia, 5 Peters, 20, the court expressed strong doubts whether it was not a political question, not proper for their decision, to protect the Cherokee Indians in their possessions, and to restrain the State of Georgia and construe and enforce its treaty obligations. Justice Johnson seemed decisive that it was.
In Massachusetts v. Rhode Island, 12 Peters, 736, 738, it was held that the boundaries between States was a political question per se, and should be adjusted by political tribunals, unless agreed to be settled as a judicial question, and in the Constitution so provided for. (Garcia v. Lee, ib. 520.)
In Barclay v. Russel, 3 Ves. 424, in respect to confiscations, it was held to be a political question, and a subject of treaty, and not of municipal jurisdiction. (p. 434.)
In Nabob of the Carnatic v. The East India Company, 2 Ves. jun. 56, the court decided that political treaties between a foreign state and subjects of Great Britain, conducting as a state under acts of Parliament, are not a matter of municipal jurisdiction, and to be examined and enforced by the judiciary.
Another class of political questions, coming still nearer this, is, Which must be regarded as the rightful government abroad *57 between two contending parties? That is never settled by the judiciary, but is left to the decision of the general government. (The Cherokee Case, 5 Peters, 50; and Williams v. Suffolk Ins. Co., 13 Peters, 419; 2 Cranch, 241; Rose v. Himely, 4 Cranch, 268; United States v. Palmer, 3 Wheat. 634, and Gelston v. Hoyt, ib. 246; The Divina Pastora, 4 Wheat. 64; 14 Ves. 353; 11 Ves. 583; 1 Edw. Ad. 1.)
The doctrines laid down in Palmer's case are as directly applicable to this in the event of two contending parties in arms in a domestic war as in a foreign. If one is recognized by the executive or legislature of the Union as the de facto government, the judiciary can only conform to that political decision. See, also, The Santissima Trinidad, 7 Wheat. 336, 337; and, further, that if our general government recognizes either as exclusively in power, the judiciary must sustain its belligerent rights, see 3 Sumner, 270. In the case of the City of Berne v. The Bank of England, 9 Ves. 348, it was held that "a judicial court cannot take notice of a foreign government not acknowledged by the government of the country in which the court sits." The same rule has been applied by this court in case of a contest as to which is the true constitution, between two, or which possesses the true legislative power in one, of our own States,  those citizens acting under the new constitution, which is objected to as irregularly made, or those under the old territorial government therein. Semb. Scott et al. v. Jones et al., 5 Howard, 374. In that case we held that no writ of error lies to us to revise a decision of a State court, where the only question is the validity of the statute on account of the political questions and objections just named. It was held, also, in Williams v. Suffolk Ins. Co., 3 Sumner, 270, that, where a claim exists by two governments over a country, the courts of each are bound to consider the claims of their own government as right, being settled for the time being by the proper political tribunal. And hence no right exists in their judicial authorities to revise that decision. (pp. 273, 275; S.C., 13 Peters, 419.) "Omnia rite acta. It might otherwise happen, that the extraordinary spectacle might be presented of the courts of a country disavowing and annulling the acts of its own government in matters of state and political diplomacy."
This is no new distinction in judicial practice any more than in judicial adjudications. The pure mind of Sir Matthew Hale, after much hesitation, at last consented to preside on the bench in administering the laws between private parties under a government established and recognized by other governments, and in full possession de facto of the records and power of the kingdom, but without feeling satisfied on inquiring, as a *58 judicial question, into its legal rights. Cromwell had "gotten possession of the government," and expressed a willingness "to rule according to the laws of the land,"  by "red gowns rather than red coats," as he is reported to have quaintly remarked. And this Hale thought justified him in acting as a judge. (Hale's Hist. of the Com. Law, p. 14, Preface.) For a like reason, though the power of Cromwell was soon after overturned, and Charles the Second restored, the judicial decisions under the former remained unmolested on this account, and the judiciary went on as before, still looking only to the de facto government for the time being. Grotius virtually holds the like doctrine. (B. 1, ch. 4, sec. 20, and B. 2, ch. 13, sec. 11.) Such was the case, likewise, over most of this country, after the Declaration of Independence, till the acknowledgment of it by England in 1783. (3 Story's Com. on Const., §§ 214, 215.) And such is believed to have been the course in France under all her dynasties and régimes, during the last half-century.
These conclusions are strengthened by the circumstance, that the Supreme Court of Rhode Island, organized since, under the second new constitution, has adopted this principle. In numerous instances, this court has considered itself bound to follow the decision of the State tribunals on their own constitutions and laws. (See cases in Smith v. Babcock, 2 Woodb. & Min.; 5 Howard, 139; Elmendorf v. Taylor, 10 Wheat. 159; Bank of U. States v. Daniel et al., 12 Peters, 32.) This, of course, relates to their validity when not overruling any defence set up under the authority of the United States. None such was set up in the trial of Dorr, and yet, after full hearing, the Supreme Court of Rhode Island decided that the old charter and its legislature were the political powers which they were bound to respect, and the only ones legally in force at the time of this transaction; and accordingly convicted and punished the governor chosen under the new constitution for treason, as being technically committed, however pure may have been his political designs or private character. (Report of Dorr's Trial, 1844, pp. 130, 131.) The reasons for this uniform compliance by us with State decisions made before ours on their own laws and constitutions, and not appealed from, are given by Chief Justice Marshall with much clearness. It is only necessary to refer to his language in Elmendorf v. Taylor, 10 Wheat. 159.
Starting, then, as we are forced to here, with several political questions arising on this record, and those settled by political tribunals in the State and general government, and whose decisions on them we possess no constitutional authority to revise, all which, apparently, is left for us to decide is the *59 other point,  whether the statute establishing martial law over the whole State, and under which the acts done by the defendants are sought to be justified, can be deemed constitutional.
To decide a point like this last is clearly within judicial cognizance, it being a matter of private personal authority and right, set up by the defendants under constitutions and laws, and not of political power, to act in relation to the making of the former.
Firstly, then, in order to judge properly whether this act of Assembly was constitutional, let us see what was the kind and character of the law the Assembly intended, in this instance, to establish, and under which the respondents profess to have acted.
The Assembly says:  "The State of Rhode Island and Providence Plantations is hereby placed under martial law, and the same is hereby declared to be in full force until otherwise ordered by the General Assembly, or suspended by proclamation of his Excellency the Governor of the State." Now, the words "martial law," as here used, cannot be construed in any other than their legal sense, long known and recognized in legal precedents as well as political history. (See it in 1 Hallam's Const. Hist., ch. 5, p. 258; 1 MacArthur on Courts-Martial, 33. The legislature evidently meant to be understood in that sense by using words of such well-settled construction, without any limit or qualification, and covering the whole State with its influence, under a supposed exigency and justification for such an unusual course. I do not understand this to be directly combated in the Πopinion just delivered by the Chief Justice. That they could mean no other than the ancient martial law often used before the Petition of Right, and sometimes since, is further manifest from the fact, that they not only declared "marti" law to exist over the State, but put their militia into the field to help, by means of them and such a law, to suppress the action of those denominated "insurgents," and this without any subordination to the civil power, or any efforts in conjunction and in coöperation with it. The defendants do not aver the existence of any civil precept which they were aiding civil officers to execute, but set up merely military orders under martial law. Notwithstanding this, however, some attempts have been made at another construction of this act, somewhat less offensive, by considering it a mere equivalent to the suspension of the habeas corpus, and another still to regard it as referring only to the military code used in the armies of the United States and England. But when the legislature enacted *60 such a system "as martial law," what right have we to say that they intended to establish something else and something entirely different? A suspension, for instance, of the writ of habeas corpus,  a thing not only unnamed by them, but wholly unlike and far short, in every view, of what they both said and did? Because they not only said, eo nomine, that they established "martial law," but they put in operation its principles; principles not relating merely to imprisonment, like the suspension of the habeas corpus, but forms of arrest without warrant, breaking into houses where no offenders were found, and acting exclusively under military orders rather than civil precepts.
Had the legislature meant merely to suspend the writ of habeas corpus, they, of course, would have said that, and nothing more. A brief examination will show, also, that they did not thus intend to put in force merely some modern military code, such as the Articles of War made by Congress, or those under the Mutiny Act in England. They do not mention either, and what is conclusive on this, neither would cover or protect them, in applying the provisions of those laws to a person situated like the plaintiff. For nothing is better settled than that military law applies only to the military; but "martial law" is made here to apply to all. (Hough on Courts-Martial, 384, note; 27 State Trials, 625, in Theobald Wolfe Tone's case.)
The present laws for the government of the military in England, also, do not exist in the vague and general form of martial law, but are explicitly restricted to the military, and are allowed as to them only to prevent desertion and mutiny, and to preserve good discipline. (1 Bl. Com. 412; 1 MacArthur on Courts-Martial, p. 20.) So, in this country, legislation as to the military is usually confined to the general government, where the great powers of war and peace reside. And hence, under those powers, Congress, by the act of 1806 (2 Stat. at Large, 359), has created the Articles of War, "by which the armies of the United States shall be governed," and the militia when in actual service, and only they. To show this is not the law by which other than those armies shall be governed, it has been found necessary, in order to include merely the divers or artificers "in the service," and the militia after mustered into it, to have special statutory sections. (See articles 96 and 97.) Till mustered together, even the militia are not subject to martial law. (5 Wheat. 20; 3 Stor. Com. Const., § 120.) And whenever an attempt is made to embrace others in its operation, not belonging to the military or militia, nor having ever agreed to the rules of the service, well may they say, we have not entered into such bonds,  in hc vincul, non veni. *61 (2 Hen. Bl. 99; 1 Bl. Com. 408, 414; 1 D. & E. 493, 550, 784; 27 State Trials, 625.) Well may they exclaim, as in Magna Charta, that "no freeman shall be taken or imprisoned but by the lawful judgment of his equals, or by the law of the land." There is no pretence that this plaintiff, the person attempted to be arrested by the violence exercised here, was a soldier or militia-man then mustered into the service of the United States, or of Rhode Island, or subject by its laws to be so employed, or on that account sought to be seized. He could not, therefore, in this view of the case, be arrested under this limited and different kind of military law, nor houses be broken into for that purpose and by that authority.
So it is a settled principle even in England, that, "under the British constitution, the military law does in no respect either supersede or interfere with the civil law of the realm," and that "the former is in general subordinate to the latter" (Tytler on Military Law, 365); while "martial law" overrides them all. The Articles of War, likewise, are not only authorized by permanent rather than temporary legislation, but they are prepared by or under it with punishments and rules before promulgated, and known and assented to by those few who are subject to them, as operating under established legal principles and the customary military law of modern times. (1 East, 306, 313; Pain v. Willard, 12 Wheat. 539, and also 19; 1 MacArthur, Courts-Martial, 13 and 215.) They are also definite in the extent of authority under them as to subject-matter as well as persons, as they regulate and restrain within more safe limits the jurisdiction to be used, and recognize and respect the civil rights of those not subject to it, and even of those who are, in all other matters than what are military and placed under military cognizance. (2 Stephen on Laws of Eng. 602; 9 Bac. Abr., Soldier, F; Tytler on Military Law, 119.) And as a further proof how rigidly the civil power requires the military to confine even the modified code martial to the military, and to what are strictly military matters, it cannot, without liability to a private suit in the judicial tribunals, be exercised on a soldier himself for a cause not military, or over which the officer had no right to order him; as, for example, to attend school instruction, or pay an assessment towards it out of his wages. (4 Taunt. 67; 4 Maule & Selw. 400; 2 Hen. Bl. 103, 537: 3 Cranch, 337; 7 Johns. 96.)
The prosecution of Governor Wall in England, for causing, when he was in military command, a soldier to be seized and flogged so that he died, for an imputed offence not clearly military and by a pretended court-martial without a full trial, and executing Wall for the offence after a lapse of twenty years, *62 illustrate how jealously the exercise of any martial power is watched in England, though in the army itself and on its own members. (See Annual Register for 1802, p. 569; 28 State Trials, p. 52, Howell's ed.).
How different in its essence and forms, as well as subjects, from the Articles of War was the "martial law" established here over the whole people of Rhode Island, may be seen by adverting to its character for a moment, as described in judicial as well as political history. It exposed the whole population, not only to be seized without warrant or oath, and their houses broken open and rifled, and this where the municipal law and its officers and courts remained undisturbed and able to punish all offences, but to send prisoners, thus summarily arrested in a civil strife, to all the harsh pains and penalties of courts-martial or extraordinary commissions, and for all kinds of supposed offences. By it, every citizen, instead of reposing under the shield of known and fixed laws as to his liberty, property, and life, exists with a rope round his neck, subject to be hung up by a military despot at the next lamp-post, under the sentence of some drum-head court-martial. (See Simmons's Pract. of Courts-Martial, 40.) See such a trial in Hough on Courts-Martial, 383, where the victim on the spot was "blown away by a gun," "neither time, place; nor persons considered." As an illustration how the passage of such a law may be abused, Queen Mary put it in force in 1558, by proclamation merely, and declared, "that whosoever had in his possession any heretical, treasonable, or seditious books, and did not presently burn them, without reading them or showing them to any other person, should be esteemed a rebel, and without any further delay be executed by the martial law." (Tytler on Military Law, p. 50, ch. 1, sec 1.)
For convincing reasons like these, in every country which makes any claim to political or civil liberty, "martial law," as here attempted and as once practised in England against her own people, has been expressly forbidden there for near two centuries, as well as by the principles of every other free constitutional government. (1 Hallam's Const. Hist. 420.) And it would be not a little extraordinary, if the spirit of our institutions, both State and national, was not much stronger than in England against the unlimited exercise of martial law over a whole people, whether attempted by any chief magistrate or even by a legislature.
It is true, and fortunate it is that true, the consequent actual evil in this instance from this declaration of martial law was smaller than might have been naturally anticipated. But we must be thankful for this, not to the harmless character of the law itself, but rather to an inability to arrest many, or from the *63 small opposition in arms, and its short continuance, or from the deep jealousy and rooted dislike generally in this country to any approach to the reign of a mere military despotism. Unfortunately, the legislature had probably heard of this measure in history, and even at our Revolution, as used by some of the British generals against those considered rebels; and, in the confusion and hurry of the crisis, seem to have rushed into it suddenly, and, I fear, without a due regard to private rights, or their own constitutional powers, or the supervisory authority of the general government over wars and rebellions.
Having ascertained the kind and character of the martial law established by this act of Assembly in Rhode Island, we ask next, how, under the general principles of American jurisprudence in modern times, such a law can properly exist, or be judicially upheld. A brief retrospect of the gradual, but decisive, repudiation of it in England will exhibit many of the reasons why such a law cannot be rightfully tolerated anywhere in this country.
One object of Parliamentary inquiry, as early as 1620, was to check the abuse of martial law by the king which had prevailed before. (Tytler on Military Law, 502.) The Petition of Right, in the first year of Charles the First, reprobated all such arbitrary proceedings in the just terms and in the terse language of that great patriot as well as judge, Sir Edward Coke, and prayed they might be stopped and never repeated. To this the king wisely replied,  "Soit droit fait come est desire,  Let right be done as desired." (Petition of Right, in Statutes at Large, 1 Charles 1.) Putting it in force by the king alone was not only restrained by the Petition of Right early in the seventeenth century, but virtually denied as lawful by the Declaration of Rights in 1688. (Tytler on Military Law, 307.) Hallam, therefore, in his Constitutional History, p. 420, declares that its use by "the commissions to try military offenders by martial law was a procedure necessary within certain limits to the discipline of an army, but unwarranted by the constitution of this country." Indeed, a distinguished English judge has since said, that "martial law," as of old, now "does not exist in England at all," "was contrary to the constitution, and has been for a century totally exploded." (Grant v. Gould, 2 Hen. Bl. 69; 1 Hale, P.C. 346; Hale, Com. Law, ch. 2, p. 36; 1 MacArthur, 55.) This is broad enough, and is correct as to the community generally in both war and peace. No question can exist as to the correctness of this doctrine in time of peace. The Mutiny Act itself, for the government of the army, in 36 Geo. 3, ch. 24, sec. 1, begins by reciting "Whereas, no man can be forejudged of life or limb, or subjected *64 in time of peace to any punishment within the realm by martial law." (Simmons's Pract. of Courts-Martial, 38.)
Lord Coke says, in 3 Inst. 52:  "If a lieutenant, or other that hath commission of martial authority in time of peace, hang or otherwise execute any man by color of martial law, this is murder." "Thom. Count de Lancaster, being taken in open insurrection, was by judgment of martial law put to death," and this, though during an insurrection, was adjudged to be murder, because done in time of peace, and while the courts of law were open. (1 Hallam's Const. Hist. 260.) The very first Mutiny Act, therefore, under William the Third, was cautious to exonerate all subjects except the military from any punishment by martial law. (Tytler on Military Law, 19, note.) In this manner it has become gradually established in England, that in peace the occurrence of civil strife does not justify individuals or the military or the king in using martial law over the people.
It appears, also, that nobody has dared to exercise it, in war or peace, on the community at large, in England, for the last century and a half, unless specially enacted by Parliament. in some great exigency and under various restrictions, and there under the theory, not that it is consistent with bills of rights and constitutions, but that Parliament is omnipotent, and for sufficient cause may override and trample on them all, temperarily.
After the civil authorities have become prostrated in particular places, and the din of arms has reached the most advanced stages of intestine commotions, a Parliament which alone furnishes the means of war  a Parliament unlimited in its powers  has, in extremis, on two or three occasions, ventured on martial law beyond the military; but it has usually confined it to the particular places thus situated, limited it to the continuance of such resistance, and embraced in its scope only those actually in arms. Thus the "Insurrection Act" of November. 1796, for Ireland, passed by the Parliament of England, extended only to let magistrates put people "out of the king's peace," and subject to military arrest, under certain circumstances. Even then, though authorized by Parliament, like the general government here, and not a State, it is through the means of the civil magistrate, and a clause of indemnity goes with it against prosecutions in the "king's ordinary courts of law." (Annual Register, p. 173, for A.D. 1798; 1 MacArthur, Courts-Martial, 34.) See also the cases of the invasions by the Pretender in 1715 and 1745, and of the Irish rebellion in 1798. (Tytler on Military Law, 48, 49, 369, 370, App. No. 6, p. 402, the act passed by the Irish Parl.; Simmons's *65 Practice of Courts-Martial, App. 633.) When speaking of the absence of other and sound precedents to justify such martial law in modern times here, I am aware that something of the kind may have been attempted in some of the doings of the British Colonial governors towards this country at the Revolution.
In the Annual Register for 1775, p. 133, June 12th, it may be seen that General Gage issued his proclamation, pardoning all who would submit, except Samuel Adams and John Hancock, and further declaring, "that, as a stop was put to the due course of justice, martial law should take place till the laws were restored to their due efficacy."
Though the engagements at Lexington and Concord happened on the 19th of April, 1775, though Parliament had in February previous declared the Colonies to be in a state of rebellion (Ibid., p. 247), and though thousands of militia had assembled near Bunker Hill before the 12th of June, no martial law had been established by Parliament, and not till that day did General Gage, alone and unconstitutionally, undertake, in the language of our fathers, to "supersede the course of the common law, and, instead thereof, to publish and order the use and exercise of martial law." (Ibid., p. 261; Journal of Old Cong., 147, a declaration on 6th July, 1775, drawn up by J. Dickenson.)
Another of these outrages was by Lord Dunmore, in Virginia, November 7th, 1775, not only declaring all the slaves of rebels free, but "declaring martial law to be enforced throughout this Colony." (Annual Register for 1775, p. 28; 4 American Archives, 74.) This was, however, justly denounced by the Virginia Assembly as an "assumed power, which the king himself cannot exercise," as it "annuls the law of the land and introduces the most execrable of all systems, martial law." (4 American Archives, 87.) It was a return to the unbridled despotism of the Tudors, which, as already shown, one to two hundred years before, had been accustomed, in peace as well as war, to try not only soldiers under it, but others, and by courts-martial rather than civil tribunals, and by no settled laws instead of the municipal code, and for civil offences no less than military ones. (2 Hen. Bl. 85; 3 Instit. 52; Stat. at Large, 1 Charles 1; Tytler on Military Law, passim.)
Having thus seen that "martial law" like this, ranging over a whole people and State, was not by our fathers considered proper at all in peace or during civil strife, and that, in the country from which we derive most of our jurisprudence, the king has long been forbidden to put it in force in war or peace, and that Parliament never, in the most extreme cases of rebellion, allows it, except as being sovereign and unlimited in power, *66 and under peculiar restrictions, the next inquiry is, whether the legislature of Rhode Island could, looking to her peculiar situation as to a constitution, rightfully establish such a law under the circumstances existing there in 1842. And, to meet this question broadly, whether she could do it, regarding those circumstances, first, as constituting peace, and next, as amounting to war. In examining this, I shall refrain from discussing the points agitated at the bar, whether the old charter under which it took place was a wise one for a republic, or whether the acts of the legislature rendering it so highly penal to resort to peaceful measures to form or put into operation a new constitution without their consent, and establishing "martial law" to suppress them, were characterized by the humanity and the civilization of the present age towards their own fellow-citizens. But I shall merely inquire, first, whether it was within the constitutional power of that legislature to pass such a law as this during peace, or, in other words, before any lawful and competent declaration of war; leaving all questions of mere expediency, as belonging to the States themselves rather than the judiciary, and being one of the last persons to treat any of them with disrespect, or attempt to rob them of any legitimate power.
At the outset it is to be remembered, that, if Parliament now exercises such a power occasionally, it is only under various limitations and restrictions, not attended to in this case, and only because the power of Parliament is by the English constitution considered as unlimited or omnipotent. But here legislative bodies, no less than the executive and judiciary, are usually not regarded as omnipotent. They are in this country now limited in their powers, and placed under strong prohibitions and checks. (8 Wheat. 88; 3 Smedes & Marshall, 673.)
This court has declared that "the legislatures are the creatures of the Constitution. They owe their existence to the Constitution. They derive their powers from the Constitution. It is their commission, and therefore all their acts must be conformable to it, or else they will be void." (Vanhorne's Lessee v. Dorrance, 2 Dall. 308; Vattel, ch. 3, sec. 34.) In most of our legislatures, also, as in Rhode Island in A.D. 1798, by a fundamental law, there has been incorporated into their constitutions prohibitions to make searches for papers or persons without a due warrant, and to try for offences except by indictment, unless in cases arising in the army or navy or militia themselves.
The genius of our liberties holds in abhorrence all irregular inroads upon the dwelling-houses and persons of the citizen, *67 and with a wise jealousy regards them as sacred, except when assailed in the established and allowed forms of municipal law. Three of the amendments to the Constitution of the United States were adopted, under such influences, to guard against abuses of power in those modes by the general government, and evidently to restrict even a modified "martial law" to cases happening among military men, or the militia when in actual service. For one of them, amendment fourth, expressly provides, that "the right of the people to be secured in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The others are amendments third and fifth. And who could hold for a moment, when the writ of habeas corpus cannot be suspended by the legislature itself, either in the general government or most of the States, without an express constitutional permission, that all other writs and laws could be suspended, and martial law substituted for them over the whole State or country, without any express constitutional license to that effect, in any emergency? Much more is this last improbable, when even the mitigated measure, the suspension of the writ of habeas corpus, has never yet been found proper by Congress, and, it is believed, by neither of the States, since the Federal Constitution was adopted. (3 Story's Com. on Const., § 1325.)
Again, the act of June 24th, 1842, as an act of legislation by Rhode Island, was virtually forbidden by the express declaration of principles made by the Rhode Island Assembly in 1798; and also by the views expressed through the delegates of their people upon adopting the Federal Constitution, June 16th, 1790. These may be seen in 1 Elliott's Deb. 370, declaring, in so many words, "that every person has a right to be secure from all unreasonable searches and seizures of his person, his papers, or his property," and warrants to search without oath and seizures by general warrant are "oppressive," and "ought not to be granted."
But as these views were expressed in connection with the constitution of the general government, though avowed to be the principles of her people generally, and as the doings in 1798 were in the form of a law, and not a constitution, it was subject to suspension or repeal; and hence it will be necessary to look into the charter to Rhode Island of 1663, her only State constitution till 1842, to see if there be any limitation in that to legislation like this, establishing martial law.
So far from that charter, royal as it was in origin, permitting *68 an unlimited authority in the legislature, it will be found expressly to forbid any laws "contrary and repugnant unto" "the laws of this our realm of England," and to require them to be, "as near as may be, agreeable" to those laws. (See Document, p. 12.)
This, so far from countenancing the establishment of martial law in Rhode Island, contrary to the Petition of Right in England and her Bill of Rights, regulated it by the same restrictions, "as near as may be." Nor did our Revolution of A.D. 1776 remove that restraint, so far as respects what was then the body of English laws. For although Rhode Island chose to retain that charter with this restriction after the Revolution, and made no new constitution with other limitations till 1842 or 1843, yet probably "the laws of England" forbidden to be violated by her legislature must be considered such as existed when the charter was granted in 1663, and as continued down to 1776. After that, her control over this country de jure ceasing, a conformity to any new laws made would not be required. But retaining the charter as the sole guide and limit to her legislature until she formed a new constitution; it seems clear that her legislature had no right, on the 25th of June, 1842, to put the whole State under martial law by any act of Parliament in force in England in 1663 or in 1776, because none such was then in force there, nor by any clause whatever in her charter, as will soon be shown, nor by any usages in her history, nor by any principles which belong to constitutional governments or the security of public liberty.
To remove all doubt on this subject, the charter does expressly allow "martial law" in one way and case to be declared, and thus impliedly forbids it in any other. Expressio unius est exclusio alterius. But so far from the martial law allowed by it being by permission of the legislature and over the whole State, it was to be declared only in war waged against a public enemy, and then by the "military officer" appointed to command the troops so engaged; and then not over their whole territory and all persons and cases, but he was to "use and exercise the law martial in such cases only as occasion shall necessarily require." (p. 15.)
Even this power, thus limited, as before shown, related to the troops of the State, and those liable to serve among them in an exigency, and when in arms against an enemy. They did not touch opponents, over whom they could exercise only the municipal laws if non-combatants, and only the law of nations and belligerent rights when in the field, and after war or rebellion is recognized as existing by the proper authorities. Again, it would be extraordinary indeed if in England *69 the king himself is restrained by Magna Charta and by the Petition as well as Declaration of Rights, binding him to these limits against martial law since the Revolution of 1688 (4 Bl. Com. 440; 2 Peters, 656), and yet he could grant a charter which should exonerate others from the obligations of Magna Charta and the general laws of the kingdom, or that they could be exonerated under it as to the power of legislation, and do what is against the whole body of English laws since the end of the sixteenth century, and what Parliament itself, in its omnipotence and freedom from restrictions, has never, in the highest emergencies, thought it proper to do without numerous limitations, regulations, and indemnities, as before explained.
Beside this, it may well be doubted whether, in the nature of the legislative power in this country, it can be considered as anywhere rightfully authorized, any more than the executive, to suspend or abolish the whole securities of person and property at its pleasure; and whether, since the Petition of Right was granted, it has not been considered as unwarrantable for any British or American legislative body, not omnipotent in theory like Parliament, to establish in a whole country an unlimited reign of martial law over its whole population; and whether to do this is not breaking up the foundations of all sound municipal rule, no less than social order, and restoring the reign of the strongest, and making mere physical force the test of right.
All our social usages and political education, as well as our constitutional checks, are the other way. It would be alarming enough to sanction here an unlimited power, exercised either by legislatures, or the executive, or courts, when all our governments are themselves governments of limitations and checks, and of fixed and known laws, and the people a race above all others jealous of encroachments by those in power. And it is far better that those persons should be without the protection of the ordinary laws of the land who disregard them in an emergency, and should look to a grateful country for indemnity and pardon, than to allow, beforehand, the whole frame of jurisprudence to be overturned, and every thing placed at the mercy of the bayonet.
No tribunal or department in our system of governments ever can be lawfully authorized to dispense with the laws, like some of the tyrannical Stuarts, or to repeal, or abolish, or suspend the whole body of them; or, in other words, appoint an unrestrained military dictator at the head of armed men.
Whatever stretches of such power may be ventured on in great crises, they cannot be upheld by the laws, as they prostrate the laws and ride triumphant over and beyond them, *70 however the Assembly of Rhode Island, under the exigency, may have hastily supposed that such a measure in this instance was constitutional. It is but a branch of the omnipotence claimed by Parliament to pass bills of attainder, belonging to the same dangerous and arbitrary family with martial law. But even those have ceased to succeed in England under the lights of the nineteenth century, and are expressly forbidden by the Federal Constitution; and neither ought ever to disgrace the records of any free government. Such laws (and martial law is only still baser and more intolerable than bills of attainder) Mr. Madison denounces, as "contrary to the first principles of the social compact, and to every principle of sound legislation." (Federalist, No. 44.)
In short, then, there was nothing peculiar in the condition of Rhode Island as to a constitution in 1842, which justified her legislature in peace, more than the legislature of any other State, to declare martial law over her whole people; but there was much in her ancient charter, as well as in the plainest principles of constitutional liberty, to forbid it. Considering this, then, and that some cases already cited show that domestic violence is still to be regarded, not as a state of war, giving belligerent rights, but as conferring only the powers of peace in a State, through its civil authorities, aided by its militia, till the general government interferes and recognizes the contest as a war, this branch of our inquires as to martial law would end here, upon my view of the pleadings, because the defendants justify under that law, and because the State legislature alone possessed no constitutional authority to establish martial law, of this kind and to this extent, over her people generally, whether in peace or civil strife. But some of the members of this court seem to consider the pleadings broad enough to cover the justification, under some rights of war, independent of the act of the Assembly, or, as the opinion just read by the Chief Justice seems to imply, under the supposed authority of the State, in case of domestic insurrection like this, to adopt an act of martial law over its whole people, or any war measure deemed necessary by its legislature for the public safety.
It looks, certainly, like pretty bold doctrine in a constitutional government, that, even in time of legitimate war, the legislature can properly suspend or abolish all constitutional restrictions, as martial law does, and lay all the personal and political rights of the people at their feet. But bolder still is it to justify a claim to this tremendous power in any State, or in any of its officers, on the occurrence merely of some domestic violence.
We have already shown, that in this last event, such a claim *71 is entirely untenable on general principles, or by the old charter of Rhode Island, and was denounced as unlawful by our fathers when attempted against them at the Revolution, and has in England been punished as murder when exercised to kill one, though taken in open arms in an insurrection. (See cases, ante.)
The judgment which the court has pronounced in this case seems to me, also, to be rested, not on any right of this kind in peace, but, on the contrary, to uphold the act of martial law only as a war measure. But the grounds have not been shown, to my conviction, for supposing that war and war measures, and the rights of war, existed legally in Rhode Island when this act passed. And, finally, it seems to me that the insurrection then existing was not in a stage of progress which would justify any mere belligerent rights; but if any, it was such rights in the general government, and not in the legislature of the State, obtained, too, by mere implication, and, as to so formidable a measure as this, operating so loosely and recklessly over all its own citizens.
It is admitted that no war had duly been declared to exist, either by Rhode Island or the United States, at the time this war measure was adopted, or when the trespass under it was committed. Yet, had either wished to exercise any war powers, they would have been legalized in our political system, not by Rhode Island, but the general government. (Constit., Art. 1, sec. 8; 3 Story's Com. on Const., §§ 215, 217; 1 Bl. Com. by Tucker, App., p. 270.)
It may not be useless to refresh our minds a little on this subject. The Constitution expressly provides that "the Congress shall have power to declare war." (Art. 1, sec. 8.) This is not the States, nor the President, and much less the legislature of a State. Nor is it foreign war alone that Congress is to declare, but "war,"  war of any kind existing legitimately or according to the law of nations. Because Congress alone, and not the States, is invested with power to use the great means for all wars,  "to raise and support armies," "to provide and maintain a navy," "to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repeal invasions," and "to provide for organizing, arming, and disciplining the militia." The largest powers of taxation, too, were conferred on Congress at the same time, and in part for this cause, with authority to borrow money on the credit of the Union, and to dispose of the public lands. But the States, deprived of these means, were at the same time properly relieved from the duty of carrying on war themselves, civil or foreign, because they were not required to incur expenses *72 to suppress even "domestic violence," or "insurrections," or "rebellions." By a provision, (sec. 4, art. 3,) "the United States shall guarantee to every State in this Union a republican form of government, and shall protect each of them against invasion, and, on application of the legislature (or of the executive when the legislature cannot be convened), against domestic violence." This exclusiveness of the war power in Congress in all cases, domestic or foreign, is confirmed, too, by another authority given to Congress, not only to organize and discipline the militia, no less than to have regular armies and navies, but "to provide for calling forth the militia" "to suppress insurrections." (Sec. 8, art. 1.) And lest it might be argued that this power to declare war and raise troops and navies was not exclusive in the general government, as is the case with some other grants to it deemed concurrent, about weights and measures, bankrupt laws, &c. (see cases cited in Boston v. Norris, post, 283), the reasons for this grant as to war, and an express prohibition on the States as to it, both show the power to be exclusive in Congress. Thus, the reasons as to the power itself are cogent for having it exclusive only in one body, in order to prevent the numerous and sudden hostilities and bloody outbreaks in which the country might be involved, with their vast expenses, if thirty States could each declare and wage war under its own impulses. (1 Bl. Com. by Tucker, App., p. 270.) And, to remove all doubt on that point, the Constitution proceeded expressly to provide in another clause a prohibition on the States (sec. 10, art. 1),  that "no State shall, without the consent of Congress," "keep troops or ships of war in time of peace," "or engage in war, unless actually invaded, or in such imminent danger as will not admit of delay."
This accorded with the sixth and ninth articles of the old Confederation, which vested in it exclusively the power to declare war, and took the power of waging it from the States, unless in case of sudden attacks by Indians or pirates, or unless actually invaded by enemies, or in such imminent danger of it that time cannot be had to consult Congress. (1 Laws of U.S., 15, 16, Bioren's ed.)
No concurrent or subordinate power is, therefore, left to the States on this subject, except by occasional and special consent of Congress, which is not pretended to have been given to Rhode Island; or unless "actually invaded" by some enemy, which is not pretended here; or unless "in such imminent danger as will not admit of delay," which manifestly refers to danger from a foreign enemy threatening invasion; or from Indians and pirates. Another circumstance to prove this, beside *73 the language itself being used in connection with foreign invasions and the danger of them, and not insurrections, is the like clauses in the old Confederation being thus restricted. One of those (article 9th) declares that "the United States in Congress assembled shall have the sole and exclusive right and power of determining on peace and war, except in the cases mentioned in the sixth article." (1 Laws of U.S., 16, Bioren's ed.) And the sixth article, after providing against foreign embassies, troops, and vessels of war by a State, adds:  "No State shall engage in any war unless such State be actually invaded by enemies, or shall have received certain advice of a resolution being formed by some nation of Indians to invade such State, and the danger is so imminent as not to admit of delay till the United States in Congress assembled can be consulted." Nor, by an additional provision, could a State grant commissions to ships of war or letters of marque, "except it be after a declaration of war by the United States," and only against the kingdom or state against whom the war had been declared, "unless such State be infested by pirates, in which case vessels of war may be fitted for that occasion," &c. (1 Laws of U.S., 15, Bioren's ed.)
It is impossible to mistake the intention in these provisions, and to doubt that substantially the same intention was embodied by restrictions in the present Constitution, similar in terms, though not entering into so great details. What is, however, decisive as to this intent in the Constitution is the action on it by the second Congress, only a few years after, and of which some were members who aided in framing the Constitution itself. That Congress, May 2d, 1792, authorized force to be used by the President to aid in repelling the invasions here referred to in the Constitution, and they are described in so many words, as "shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe." (1 Stat. at Large, 264.) So again in the act of Feb. 28, 1795 (1 Stat. at Large, 424), and still further sustaining this view, the power to aid in suppressing insurrections in a State is given in a separate section, showing that they were not deemed the invasions and the "imminent danger" of them expressed in different sections of the act of Congress as well as of the Constitution. If, however, this "imminent danger" could, by any stretch of construction, be considered broader, it did not exist here so as to prevent "delay" in applying to the President first; because, in truth, before martial law was declared, time had existed to make application to Congress and the President, and both had declined to use greater force, or to declare war, and the judicial tribunals of the State were still unmolested in *74 their course. Besides this, at the time of the trespass complained of here, the few troops which had before taken up arms for the new constitution had been disbanded, and all further violence disclaimed.
Whoever, too, would justify himself under an exception in a law or constitution, must set it up and bring his case within it, neither of which is attempted here as to this exception; but the justification is, on the contrary, under this head, placed by the defendant and the court on the existence of war, and rights consequent on its existence.
Some mistake has arisen here, probably, from not adverting to the circumstance, that Congress alone can declare war, and that all other conditions of violence are regarded by the Constitution as but ordinary cases of private outrage, to be punished by prosecutions in the courts; or as insurrections, rebellions, or domestic violence, to be put down by the civil authorities, aided by the militia; or, when these prove incompetent, by the general government, when appealed to by a State for aid, and matters appear to the general government to have reached the extreme stage, requiring more force to sustain the civil tribunals of a State, or requiring a declaration of war, and the exercise of all its extraordinary rights. Of these last, when applied to as here, and the danger has not been so imminent as to prevent an application, the general government must be the judge, and the general government is responsible for the consequences. And when it is asked, what shall a State do, if the general government, when applied to, refrains to declare war till a domestic force becomes very formidable, I reply, exert all her civil power through her judiciary and executive, and if these fail, sustain them by her militia, coöperating, and not independent, and if these fail, it is quite certain that the general government will never hesitate to strengthen the arm of the State when too feeble in either of these modes to preserve public order. And how seldom this will be required of the general government, or by means of war, may be seen by our unspotted, unbroken experience of this kind, as to the States, for half a century, and by the obvious facts, that no occasion can scarcely ever, in future, arise for such interference, when the violence, at the utmost, must usually be from a minority of one State, and in the face of the larger power of the majority within it, and of the coöperation, if need be, of the whole of the rest of the Union.
Carry these constitutional provisions with us, and the facts which have existed, that there had been no war declared by Congress, no actual invasion of the State by a foreign enemy, no imminent danger of it, no emergency of any kind, *75 which prevented time or delay to apply to the general government, and remember that, in this stage of things, Congress omitted or declined to do any thing, and that the President also declined to consider a civil violence or insurrection as existing so as to justify his ordering out troops to suppress it. The State, then, in and of itself, declared martial law, and the defendants attempted to enforce it. In such a condition of things, I am not prepared to say that the authorities of a State alone can exercise the rights of war against their own citizens; persons, too, who, it is to be remembered, were for many purposes at the same time under the laws and protection of the general government. On the contrary, it seems very obvious, as before suggested, that in periods of civil commotion the first and wisest and only legal measure to test the rights of parties and sustain the public peace under threatened violence is to appeal to the laws and the judicial tribunals. When these are obstructed or overawed, the militia is next to be ordered out, but only to strengthen the civil power in enforcing its processes and upholding the laws. Then, in extreme cases, another assistance is resorted to in the suspension of the writ of habeas corpus. And, finally, if actual force, exercised in the field against those in battle array and not able to be subdued in any other manner, becomes necessary, as quasi war, whether against a foreign foe or rebels, it must first, as to the former, be declared by Congress, or recognized and allowed by it as to the latter, under the duty of the United States "to protect each of them against invasion" and "against domestic violence." (Art. 4, sec. 4.) When this is not done in a particular case by Congress, if then in session, it is done by the President in conformity to the Constitution (Art. 1, sec. 8) and the act of Congress of February 28th, 1795 (1 Stat. at Large, 424), "to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions."
Under all these circumstances, then, to imply a power like this declaration of martial law over a State as still lawfully existing in its legislature would be to imply what is forbidden by all constitutional checks, forbidden by all the usages of free governments, forbidden by an exclusive grant of the war power to Congress, forbidden by the fact that there were no exceptions or exigencies existing here which could justify it, and, in short, forbidden by the absence of any necessity in our system for a measure so dangerous and unreasonable, unless in some great extremity, if at all, by the general government, which alone holds the issues of war and the power and means of waging it.
Under these views and restrictions, the States have succeeded well, thus far,  over half a century,  in suppressing domestic *76 violence in other ways than by martial law. The State courts, with the aid of the militia, as in Shays's rebellion and the Western insurrection, could, for aught which appears, by help of the posse comitatus, or at least by that militia, have in this case dispersed all opposition. They did this in both of those instances, so much more formidable in numbers, and made no resort to martial law. (See before, and Minot's History, 163, 178.) In one of them, not even the writ of habeas corpus was suspended by the State, and never by the United States, though empowered to do that in dangerous emergencies. (2 Kent's Com. 24; 2 Story's Com. on Const., § 1335.) But if civil process, aided by the militia, should fail to quell an insurrection against State laws, which has never yet happened in our history, then an appeal lies, and is appropriate, to the general government for additional force, before a resort can be had to supposed belligerent rights, much less to any exploded and unconstitutional extremes of martial law.
As before shown, such an appeal had been made here, but not complied with, because, I presume, the civil authority of the State, assisted by its own militia, did not appear to have failed to overcome the disturbance. How, then, let me ask, had the State here become possessed of any belligerent rights? how could it in any way be possessed of them, at the time of the passage of the act declaring martial law, or even at the time of the trespass complained of? I am unable to discover. Congress, on this occasion, was in session, ready to act when proper and as proper, and it alone could, by the Constitution, declare war, or, under the act of May 2d, 1792, allow the militia from an adjoining State to be called out. (1 Stat. at Large, 264.) But Congress declared no war, and conferred no rights of war. The act of Feb. 28th, 1795 (1 Stat. at Large, 424), seems to be made broader as to the power of the President over all the militia, and, indeed, over the regular troops, to assist on such an occasion, by another act of March 3d, 1807 (2 Stat. at Large, 443). But the President, also, did nothing to cause or give belligerent rights to the State. He might, perhaps, have conferred some such rights on the militia, had he called them out, under the consent of Congress; but it would be unreasonable, if not absurd, to argue that the President, rather than Congress, was thus empowered to declare war, or that Congress meant to construe such insurrections, and the means used to suppress them, as wars; else Congress itself should in each case pronounce them so, and not intrust so dangerous a measure to mere executive discretion. But he issued no orders or proclamations. Had he done so, and marched troops, through the action of the Executive under *77 the standing law is not waging war, yet, I concede, it is attempting to suppress domestic violence by force of arms, and in doing it the President may possess and exert some belligerent rights in some extreme stages of armed opposition. It is he, however, and those acting under his orders, who, it will be seen, may possibly then, at times, use some such rights, and not the State or its organs. Nor is it till after the President has interfered that such rights arise, and then they arise under the decision and laws and proceedings of the general government. Then the organs of that government have come to the conclusion, that the exercise of force independent of the civil and State authorities has become necessary. (Federalist, No. 29.) The President has been considered the paramount and final judge as to this, whether in invasion or rebellion, and not the governors or legislatures of States. This was fully settled during the war of 1812 with England. (3 Story's Com. on Const., § 1206; 11 Johns. 150.) He may then issue his proclamation for those in insurrection to disperse, and, if not dispersing, he may afterwards call out the militia to aid in effecting it. (Martin v. Mott, 12 Wheat. 30.) But not till then do any belligerent rights exist against those even in arms, and then only by or under him. It is a singular coincidence, that, in England, it is held to be not "lawful" for the chief magistrate to order out the militia in case of "rebellion and insurrection," without "the occasion being first communicated to Parliament, if sitting, and, if not sitting, published by proclamation." (1 MacArthur, 28; 12 Statutes at Large, 432, 16 George 3, ch. 3; 8 Stat. at Large, 634, sec. 116.) And here, under the act of 1793, the President himself could not call out the militia from another State to assist without consulting Congress, if in session, much less could he declare war. (1 Stat. at Large, 264, sec. 2.)
When the President issues his orders to assemble the militia to aid in sustaining the civil authorities of the State to enforce the laws, or to suppress actual array and violence by counter force, obedience to those orders by the militia then undoubtedly becomes a military duty. (12 Wheat. 31.) So in England. (8 Stat. at Large, sec. 116; 11 Johns. 150; 4 Burrows, 2472; 12 Johns. 257.) And a refusal to obey such a military summons may be punished in due form, without doubt, by a court-martial. (Houston v. Moore, 5 Wheat. 1, 20, 35, 37; 3 Story's Com. on Const., § 120.) When such troops, called out by the general government, are in the field on such an occasion, what they may lawfully do to others, who are in opposition, and do it by any mere belligerent rights, is a very different question. For, now, I am examining only whether any *78 belligerent rights before this event existed, on the part of the State, as matters then stood, commensurate with this strong measure of putting martial law in force over the whole State. The precedents, as well as the sound reasons and principles just adverted to, are all, in my view, the other way.
Under our present Constitution, the first, if not nearest, precedent in history as to the course proper to be followed in any State insurrection is Shays's rebellion in Massachusetts. Having occurred in 1787, before the formation of the Federal Constitution, and having been suppressed by the State alone under its own independent authority (Minot's History of Shays's Insurrection, p. 95), it was untrammelled by any of the provisions now existing about war and insurrections in that Constitution. But the course pursued on that occasion is full of instruction and proof as to what was deemed the legal use of the militia by the State, when thus called out, under the old Confederation, and the extent of the rights of force incident to a State on a rebellion within its limits. We have before shown that the provisions in the old Confederation as to war were much the same in substance as in the present Constitution. Now, in Shays's rebellion the resort was not first had at all to the military, but to civil power, till the courts themselves were obstructed and put in jeopardy. And when the militia were finally called out, the whole State, or any part of it, was not put under martial law. The writ of habeas corpus was merely suspended for a limited time, and the military ordered to aid in making arrests under warrants, and not by military orders, as here. They were directed to protect civil officers in executing their duty, and nothing more, unless against persons when actually in the field obstructing them. (Ibid. 101.)
The language of Governor Bowdoin's orders to Major-General Lincoln, January 19th, 1787, shows the commendable caution deemed legal on such an occasion:  "Consider yourself in all your military offensive operations constantly as under the direction of the civil officer, saving where any armed force shall appear and oppose your marching to execute these orders."
This gives no countenance to the course pursued on this occasion, even had it been attempted to be justified in the pleadings as a right of war, though in a domestic insurrection, and not yet recognized as existing so as to require countenance and assistance through the interposition of force by the general government. Even General Gage did not, though illegally, venture to declare martial law in 1775 till the fact occurred, as he averred, that the municipal laws could not be executed. Much less was it unlikely here that these laws could not have *79 been executed by the civil power, or at least by that assisted by the militia, when the judges of the Supreme Court of Rhode Island had been appointed their own judges, and been approved by those who were considered in an insurrectionary condition.
In substantial accordance with these views was, likewise, the conduct of the general government in the insurrection against its own laws in the only other case of rebellion of much note, except the controverted one of Burr's, in our national history. It was in Western Pennsylvania, in 1793, and where the rebellion, or violent resistance, and even treason, as adjudged by the courts of law in The United States v. The Insurgents of Pennsylvania, 2 Dallas, 335, were committing against the government of the United States.
So far, however, from martial law having then been deemed proper or competent to be declared by Congress, and enforced anywhere, or even the writ of habeas corpus suspended, the troops were called out expressly to coöperate with the civil authorities, these having proved insufficient. (Findley's Hist., App. 316, 317.) But that of itself did not seem to be considered as per se amounting to war, or as justifying war measures. The government, therefore, neither declared war, nor waged it without that declaration, but did what seems most humane and fit on such occasions, till greater resistance and bloodshed might render war measures expedient; that is, marched the troops expressly with a view only to "cause the laws to be duly executed."
Nor was this done till Judge Peters, who officiated in that district in the courts of the United States, certified that he had issued warrants which the marshal was unable to execute, without military aid. (1 American State Papers, 185.) The acts of Congress then required such a certificate, before allowing the militia to be called out. (1 Stat. at Large, 264.) The marshal also wrote, that he needed "military aid." (1 Am. State Papers, 186.) The additional force, authorized by Congress, was expressly for that same purpose, as well as to suppress such combinations. (1 Stat. at Large, 403.) And though with these objects, so fully did it seem proper to reach this last one by means of the first, the orders in the field were to a like effect, and the arrests made were by authority of the civil officers, and those seized were carried before those authorities for hearing and trial. (Findley, 181.)
The Secretary of War, likewise, issued public orders, in which, among other things, it is stated, that "one object of the expedition is to assist the marshal of the district to make prisoners," &c. "The marshal of the District of Pennsylvania will move with you and give you the names of the offenders, their *80 descriptions, and respective places of abode, who are to be made prisoners under criminal process." And so exclusively did Congress look to the laws of the land for a guide, that special sessions of the Circuit Court nearer the place of offence were allowed (March 2d, 1793, 1 Stat. at Large, 334) to be called, when necessary, to try offenders.
The President, throughout the excitement, evinced the characteristic moderation and prudence of Washington, constantly enjoined a subordination of the military to the civil power, and accompanied the troops in person to see that the laws were respected. (Findley's History of the Western Insurrection, p. 144.) "He assured us," says Findley (p. 179), "that the army should not consider themselves as judges or executioners of the laws, but as employed to support the proper authorities in the execution of them." That he had issued orders "for the subordination of the army to the laws." (p. 181.) This was in accordance with the course pursued in England on some similar occasions. (1 MacArthur on Courts-Martial, 28.) And though some arrests were to be made, they were to be in a legal civil form, for he said, "Nothing remained to be done by them but to support the civil magistrate in procuring proper subjects to atone for the outrages that had been committed." (Findley, 187.) The orders or warrants executed seem to have emanated from the federal judge of the Pennsylvania District. (pp. 200, 201, 204, ch. 16.)
The arrests in 1805 and 1806, in what is called Burr's conspiracy, furnish another analogy and precedent. They were not made till an oath and warrant had issued, except in one or two cases. And in those the prisoners were immediately discharged, as illegally arrested, as soon as writs of habeas corpus could be obtained and enforced. By the Constitution, (Art. 3, sec. 9,) "the privilege of the writ of habeas corpus shall not be suspended unless when, in cases of rebellion or invasion, the public safety may require it."
And Congress then declined to suspend that writ, much less to declare martial law, even where the supposed rebellion existed. Nor was the latter done by the States, in the rebellions of 1787 and 1794, as before explained, but merely the writ of habeas corpus suspended in one of them. It is further characteristic of the jealousy of our people over legislative action to suspend the habeas corpus, though expressly allowed by the Constitution, that, after a bill to do it in 1807 seems to have passed the Senate of the United States, through all its readings in one day, and with closed doors, the House of Representatives rejected it, on the first reading, by a vote of 113 to 19. (See the Journals of the two Houses, 25th and 27th *81 Jan., 1807.) And this although the bill to suspend the habeas corpus provided it should be done only when one is charged on oath with treason or misdemeanour affecting the peace of the United States, and imprisoned by warrant on authority of the President of the United States, or the Governor of a State or Territory. It was not deemed prudent to suspend it, though in that mild form, considering such a measure at the best but a species of dictatorship, and to be justified only by extreme peril to the public safety. And Mr. Jefferson has left on record his opinion, that it was much wiser, even in insurrections, never even to suspend the writ of habeas corpus. (2 Jefferson's Cor. and Life, 274, 291.) But what would have been thought then of a measure of "martial law," established over the whole country, acting too without oath or warrant, and under no grant by the Constitution, instead of a mere suspension of a writ, and which suspension was permitted by the Constitution in certain exigencies? Again, if only to repeal or suspend the habeas corpus requires a permissive clause in the Constitution, how much more should the repeal or suspension of all municipal laws? Indeed, the Mutiny Act itself, as for instance that of 53 George 3, ch. 18, sec. 100, does not allow the military to break open a house to arrest so bad a culprit as a deserter without a warrant and under oath. (38 Stat. at Large, 97.)
So, though a rebellion may have existed in Burr's case in the opinion of the Executive, and troops had been ordered out to assist in executing the laws and in suppressing the hostile array, this court held that an arrest by a military officer of one concerned in the rebellion, though ordered by the Executive, was not valid, unless he was a person then actually engaged in hostilities, or in warlike array, or in some way actually abetting those who then were so. (Bollman and Swartout's case, 4 Cranch, 75, 101, 126; 1 Burr's Tr. 175.) And if an arrest was made without an order of the commander-in-chief, the court would discharge at once. (Alexander's case, 4 Cranch, 75, 76, in note.) It should also be by warrant, and on oath; and, in most cases, these were then resorted to by General Wilkinson. (Annual Register for 1807, p. 84.) And so jealous were the people then of abuses, that a neglect by him of obedience to the requisitions of the habeas corpus, in some respects, led to a presentment against his conduct by the grand jury of New Orleans. (Annual Register for 1807, p. 98.) But here no actual arrest was made, though attempted, and, what was less justifiable, without oath or warrant the house was broken into, and hence any justification by martial law failing which might be set up for the former would seem more clearly to fail for the latter. Certainly it must *82 fail unless the latter was proper in this way, under all the circumstances, though no one was there liable to be arrested, and none actually arrested.
This doctrine of their failing is familiar in municipal law in breaking houses to seize persons and property on legal precept, when none are found there liable to be seized. (5 Coke, 93, a; Bac. Abr. Execution, W.)
In civil dissensions, the case stands very differently from foreign ones. In the latter, force is the only weapon, after reason and negotiation have failed. In the former, it is not the course of governments, nor their right, when citizens are unable to convince each other, to fly at once to arms and military arrests and confiscations. The civil power can first be brought to bear upon these dissensions and outbreaks through the judiciary, and usually can thus subdue them.
All these principles, and the precedents just referred to, show that the course rightfully to be pursued on such unfortunate occasions is that already explained; first resorting to municipal precepts, next strengthening them by coöperation of the militia if resisted, and then, if the opposition are in battle array, opposing the execution of such precepts, to obtain further assistance, if needed, from the general government to enforce them, and to seize and suppress those so resisting in usual array against the State.
But affairs must advance to this extreme stage though all intermediate ones, keeping the military in strict subordination to the civil authority except when acting on its own members, before any rights of mere war exist or can override the community, and then, in this country, they must do that under the countenance and controlling orders of the general government. Belligerent measures, too, must come, not from subordinates, but from those empowered to command, and be commensurate only with the opposing array,  the persons, places, and causes where resistance flagrante bello exists of the reckless character justifying violence and a disregard of all ordinary securities and laws. It is not a little desirable that this doctrine should prove to be the true one, on account of its greater tendency to secure orderly and constitutional liberty instead of rude violence, to protect rights by civil process rather than the bayonet, and to render all domestic outbreaks less bloody and devasting than they otherwise would be.
There having been, then, no rights of war on the part of the State when this act of Assembly passed, and certainly none which could justify so extreme a measure as martial law over the whole State as incident to them, and this act being otherwise unconstitutional, the justification set up under it must, in *83 my opinion, fail. If either government, on the 24th of June, possessed authority to pass an act establishing martial law to this extent, it was, of course, that of the United States,  the government appointed in our system to carry on war and suppress rebellion or domestic violence when a State is unable to do it by her own powers. But as the general government did not exercise this authority, and probably could not have done it constitutionally in so sweeping a manner, and in such an early stage of resistance, if at all, this furnishes an additional reason why the State alone could not properly do it.
But if I err in this, and certain rights of war may exist with one of our States in a civil strife like the present, in some extreme stage of it, independent of any act of Congress or the President recognizing it, another inquiry would be, whether, in the state of affairs existing at this time, such rights had become perfected, and were broad enough, if properly pleaded, to cover this measure of martial law over the whole State, and the acts done under it, in the present instance. The necessities of foreign war, it is conceded, sometimes impart great powers as to both things and persons. But they are modified by those necessities, and subjected to numerous regulations of national law and justice, and humanity. These, when they exist in modern times, while allowing the persons who conduct war some necessary authority of an extraordinary character, must limit, control, and make its exercise under certain circumstances and in a certain manner justifiable or void, with almost as much certainty and clearness as any provisions concerning municipal authority or duty. So may it be in some extreme stages of civil war. Among these, my impression is that a state of war, whether foreign or domestic, may exist, in the great perils of which it is competent, under its rights and on principles of national law, for a commanding officer of troops under the controlling government to extend certain rights of war, not only over his camp, but its environs and the near field of his military operations. (6 American Archives, 186.) But no further, nor wider. (Johnson v. Davis et al., 3 Martin, 530, 551.) On this rested the justification of one of the great commanders of this country and of the age, in a transaction so well known at New Orleans.
But in civil strife they are not to extend beyond the place where insurrection exists. (3 Martin, 551.) Nor to portions of the State remote from the scene of military operations, nor after the resistance is over, nor to persons not connected with it. (Grant v. Gould et al., 2 Hen. Bl. 69.) Nor, even within the scene, can they extend to the person or property of citizens against whom no probable cause exists which *84 may justify it. (Sutton v. Johnston, 1 D. & E. 549.) Nor to the property of any person without necessity or civil precept. If matters in this case had reached such a crisis, and had so been recognized by the general government, or if such a state of things could and did exist as to warrant such a measure, independent of that government, and it was properly pleaded, the defendants might perhaps be justified within those limits, and under such orders, in making search for an offender or an opposing combatant, and, under some circumstances, in breaking into houses for his arrest.
Considerations like these show something in respect to the extent of authority that could have been exercised in each of these cases as a belligerent right, had war been properly declared before and continued till that time (6 American Archives, 232), neither of which seems to have been the case. It is obvious enough that, though on the 24th of June, five days previous, Luther had been in arms at Providence, several miles distant, under the governor appointed under the new constitution, in order to take possession of some of the public property there, and though in the record it is stated that the defendants offered to prove he was at this time in arms somewhere, yet, the fact not being deemed material under the question of martial law, on which the defence was placed, it does not seem to have been investigated. How it might turn out can be ascertained only on a new trial. But to show it is not uncontroverted, the other record before us as to this transaction states positively that Mrs. Luther offered to prove there was no camp nor hostile array by any person in the town where this trespass was committed, on the 29th of June, nor within twenty-five miles of it in any part of the State, and that Dorr had, on the 27th instant, two days previous, published a statement against "any further forcible measures" on his part, and directing that the military "be dismissed."
The collection which had there happened, in relation to the disputed rights as to the public property under the new constitution, seems to have been nothing, on the evidence, beyond a few hundreds of persons, and nothing beyond the control of the courts of law, aided by the militia, if they had been wisely resorted to,  nothing which, when represented to the Executive of the United States, required, in his opinion, from its apprehended extent or danger, any war measures,  the calling out of the militia of other States, or aid of the public troops, or even the actual issue of a proclamation; and the persons who did assemble had; it appears, two days before the trespass, been disbanded, and further force disclaimed, without a gun being fired, or blood in any way shed, on that occasion.
*85 Under the worst insurrections, and even wars, in our history, so strong a measure as this is believed never to have been ventured on before by the general government, and much less by any one of the States, as within their constitutional capacity, either in peace, insurrection, or war. And if it is to be tolerated, and the more especially in civil feuds like this, it will open the door in future domestic dissensions here to a series of butchery, rapine, confiscation, plunder, conflagration, and cruelty, unparalleled in the worst contests in history between mere dynasties for supreme power. It would go in practice to render the whole country  what Bolivar at one time seemed to consider his  a camp, and the administration of the government a campaign.
It is to be hoped we have some national ambition and pride, under our boasted dominion of law and order, to preserve them by law, by enlightened and constitutional law, and the moderation of superior intelligence and civilization, rather than by appeals to any of the semibarbarous measures of darker ages, and the unrelenting, lawless persecutions of opponents in civil strife which characterized and disgraced those ages.
Again, when belligerent measures do become authorized by extreme resistance, and a legitimate state of war exists, and civil authority is prostrate, and violence and bloodshed seem the last desperate resort, yet war measures must be kept within certain restraints in all civil contests in all civilized communities.
"The common laws of war, those maxims of humanity, moderation, and honor," which should characterize other wars, Vattel says (B. 3, ch. 8, sec. 294 and 295), "ought to be observed by both parties in every civil war." Under modern and Christian civilization, you cannot needlessly arrest or make war on husbandmen or mechanics, or women and children. (Vattel, B. 3, ch. 8, sec. 149.) The rights of war are against enemies, open and armed enemies, while enemies and during war, but no longer. And the force used then is not to exceed the exigency,  not wantonly to injure private property, nor disturb private dwellings and their peaceful inmates. (Vattel, B. 3, ch. 8, sec. 148.) Much will be allowed to discretion, if manifestly exercised with honesty, fairness, and humanity. But the principles of the common law, as opposed to trials without a jury, searches of houses and papers without oath or warrant, and all despotic invasions on private personal liberty,  the customary usages to respect the laws of the land except where a great exigency may furnish sufficient excuse,  should all limit this power, in many respects, in practice. (2 Stephens on Laws of England, 602.) The *86 more especially must it be restrained in civil strife, operating on our own people in masses and under our system of government in distributing authority between the States and the Union, as the great powers of war are intrusted to the latter alone, and the latter is also to recognize when that which amounts to a rebellion exists, and interfere to suppress it, if necessary, with the incidents to such interference. Under the right of war the defence must also rest, not only on what has been alluded to, but, as before suggested, on the question whether the insurrection at the time of this trespass was not at an end. For if one has previously been in arms, but the insurrection or war is over, any belligerent rights cease, and no more justify a departure from the municipal laws than they do before insurrection or war begins. If any are noncombatants, either as never having been engaged in active resistance, or as having abandoned it, the rights of civil warfare over them would seem to have terminated; and the prosecution and punishment of their past misconduct belongs then to the municipal tribunals, and not to the sword and bayonet of the military.
The Irish Rebellion Act, as to martial law, was expressly limited "from time to time during the continuance of the said rebellion." (Tytler on Military Law, 405.) And in case of a foreign war it is not customary to make prisoners and arrest enemies after the war has ceased and been declared abandoned, though the terms of peace have not been definitely settled. And if any of them voluntarily, like Bonaparte, abandon the contest, or surrender themselves as prisoners, the belligerent right to continue to imprison them after the war is at an end, much less to commit violence, as here, on others, with a view to capture them, is highly questionable, and has been very gravely doubted. (Vattel, B. 3, ch. 8, sec. 152, 154.) Circumstances like these make the rule of force and violence operate only to a due extent and for a due time, within its appropriate sphere, and secure beyond that extent and time the supremacy of the ordinary laws of the land. Much more in a social or civil war, a portion of the people, where not then in arms, though differing in opinion, are generally to be treated as noncombatants, and searched for and arrested, if at all, by the municipal law, by warrant under oath, and tried by a jury, and not by the law martial.
Our own and English history is full of such arrests and trials, and the trials are held, not round a drum-head or cannon, but in halls of justice and under the forms of established jurisprudence. (See State Trials, passim.) The writ of habeas corpus, also, unless specially suspended by the legislature having *87 power to do so, is as much in force in intestine war as in peace, and the empire of the laws is equally to be upheld, if practicable. (Ibid. 532; 4 Cranch, 101; 2 Hen. Bl. 69.)
To conclude, it is manifest that another strong evidence of the control over military law in peace, and over these belligerent rights in civil strife, which is proper in a bold and independent judiciary, exists in this fact, that whenever they are carried beyond what the exigency demands, even in cases where some may be lawful, the sufferer is always allowed to resort, as here, to the judicial tribunals for redress. (4 Taunt. 67, and Baily v. Warder, 4 Maule & Selw. 400. See other cases before cited.)
Bills or clauses of indemnity are enacted in England, otherwise officers would still oftener be exposed to criminal prosecution and punishment for applying either belligerent rights or the military law in an improper case, or to an excess in a proper case, or without probable cause. (1 MacArthur on Courts-Martial, 33, 34; Tytler on Military Law, 49 and 489; see last act in Appendix to Tytler and Simmons.) And when in an insurrection an opponent or his property is treated differently from what the laws and constitution, or national law, sanction, his remedy is sacred in the legal tribunals. And though the offender may have exposed himself to penalties and confiscations, yet he is thus not to be deprived of due redress for wrongs committed on himself.
The plaintiff in one of these records is a female, and was not at all subject to military duty and laws, and was not in arms as an opponent supporting the new constitution. And if the sanctity of domestic life has been violated, the castle of the citizen broken into, or property or person injured, without good cause, in either case a jury of the country should give damages, and courts are bound to instruct them to do so, unless a justification is made out fully on correct principles. This can and should be done without any vindictive punishment, when a party appears to have acted under a supposed legal right. And, indeed, such is the structure of our institutions, that officers, as well as others, are often called on to risk much in behalf of the public and of the country in time of peril. And if they appear to do it from patriotism, and with proper decorum and humanity, the legislature will, on application, usually indemnify them by discharging from the public treasury the amount recovered for any injury to individual rights. In this very case, therefore, the defence seems to be by the State, and at its expense. It shows the beautiful harmony of our system, not to let private damage be suffered wrongfully without redress, but, at the same time, not to let a public agent suffer, *88 who, in a great crisis, appears to have acted honestly for the public, from good probable cause, though in some degree mistaking the extent of his powers, as well as the rights of others. But whether any of the rights of war, or rights of a citizen in civil strife, independent of the invalid act of the Assembly declaring martial law over all the State, have here, on the stronger side against the feebler, been violated, does not seem yet to have been tried. The only point in connection with this matter which appears clearly to have been ruled at the trial was the legality or constitutionality of that act of Assembly. I think that the ruling made was incorrect, and hence that there has been a mistrial.
The judgment should, in this view, be reversed; and though it is very doubtful whether, in any other view, as by the general rights of war, these respondents can justify their conduct on the facts now before us; yet they should be allowed an opportunity for it, which can be granted on motion below to amend the pleas in justification.

Orders.

MARTIN LUTHER v. LUTHER M. BORDEN ET AL.
This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Rhode Island, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be and the same is hereby affirmed, with costs.

RACHEL LUTHER v. LUTHER M. BORDEN ET AL.
This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Rhode Island, and on the questions and points on which the judges of the said Circuit Court were opposed in opinion, and which were certified to this court for its opinion agreeably to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, and it appearing to this court, upon an inspection of the said transcript, that no point in the case, within the meaning of the act of Congress, has been certified to this court, it is thereupon now here ordered and decreed by this court, that this cause be and the same is hereby dismissed, and that this cause be and the same is hereby remanded to the said Circuit Court to be proceeded in according to law.
NOTES
[*] Mr. Justice Catron, Mr. Justice Daniel, and Mr. Justice McKinley were absent on account of ill health when this case was argued.